NAME _Tuan Phuong Nguyen_

PRISON NUMBER _J-20604_

CURRENT ADDRESS OR PLACE OF CONFINEMENT _P.O. Box 901, Imperial_

CITY, STATE, ZIP CODE _Valley, California 92251_

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

FILED

NOV 19 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

2254 ✓    1983

FILING FEE PAID
Yes ____  No ✓

IFP MOTION FILED
Yes ____  No ✓

COPIES SENT TO
Court ✓  ProSe

_Tuan Phuong Nguyen_ ,
(FULL NAME OF PETITIONER)

PETITIONER

v.

_V.M. Almager (A) Warden_ ,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

RESPONDENT

and

_____ ,

The Attorney General of the State of
California, Additional Respondent.

Civil No. _'07CV 2213 L_   **RBB**
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

PETITION FOR WRIT OF HABEAS CORPUS

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack: _____
   _Superior Court, Orange County, California_

2. Date of judgment of conviction: _October 7, 2005_

3. Trial court case number of the judgment of conviction being challenged: _05CF1163_

4. Length of sentence: _Five Years_

5. Sentence start date and projected release date: March 10, 2006

6. Offense(s) for which you were convicted or pleaded guilty (all counts): Penal Code Section 67, Count One thru Seven

7. What was your plea? (CHECK ONE)
   (a) Not guilty      ☒
   (b) Guilty          ☐
   (c) Nolo contendere ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury       ☒
   (b) Judge only ☐

9. Did you testify at the trial?
   ☐ Yes ☐ No

**DIRECT APPEAL**

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: Affirming Superior Court Judgment
    (b) Date of result, case number and citation, if known: June 13, 2007; Case No: G036837
    (c) Grounds raised on direct appeal: Trial Court Prejudicially Erred in Violation of appellant's Right to due process and Effective assistance of Counsel by Refusing to disclose Material Evidence in Response to Post-trial Pitchess Motion; denying a New trial

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: Denied "En Banc."
    (b) Date of result, case number and citation, if known: 9/25/07; S154677
    (c) Grounds raised: Erred in Elevating the Standard of Review of a Post-trial Pitchess Motion From 'Materiality' to Prejudice. Erred in finding No Cunningham Violation where the Trial Court imposed the Consecutive terms for all Counts based on factors in Aggravation not found by the Jury beyond a Reasonable Doubt.

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a) Result: _____

    (b) Date of result, case number and citation, if known: _____

        _____

    (c) Grounds raised: _____

        _____

        _____

        _____

### COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☐ Yes  ☒ No

15. If your answer to #14 was "Yes," give the following information:

    (a) **California Superior Court** Case Number: _____

    (b) Nature of proceeding: _____

        _____

    (c) Grounds raised: _____

        _____

        _____

        _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
        ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☐ Yes  ☒ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number:_____

    (b) Nature of proceeding: _____
_____

    (c) Grounds raised: _____
_____
_____
_____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes  ☒ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number:_____

    (b) Nature of proceeding: _____
_____

    (c) Grounds raised: _____
_____
_____
_____
_____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?

      ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

20.  If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

_____

_____

_____

_____

## COLLATERAL REVIEW IN FEDERAL COURT

21.  Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
     ☒ Yes ☐ No    (IF "YES" SKIP TO #22)
     (a)  If no, in what federal court was the prior action filed? _____
          (i) What was the prior case number? _____
          (ii) Was the prior action (CHECK ONE):
               ☐ Denied on the merits?
               ☐ Dismissed for procedural reasons?
          (iii) Date of decision: _____
     (b)  Were any of the issues in this current petition also raised in the prior federal petition?
          ☐ Yes ☐ No

     (c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
          ☐ Yes ☐ No

---

CAUTION:

  ● **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

  ● **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

  ●**Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: The trial Court's erred Deprived Petitioner of Due process As well As the Effective Assistance of Counsel.

Supporting FACTS (state *briefly* without citing cases or law) the Petitioner filed a Motion for New trial on the Grounds of ineffective assistance of Counsel and denial of due process based up on the trial Court's failure to disclose information found in detective Limo's file. (2CT. pp. 358-381.) this procedural Mechanism for Criminal defense discovery [the *Pitchess* Motion.].. Must be viewed against the larger background of the prosecutor's Constitutional obligation to disclose to a defendant Material exculpatory evidence so as not to infringe the defendant's right to a fair trial. The Motion alleged in part that the trial Court had improperly denied discovery of Material and exculpatory evidence Contained in Limo's personnel file. Petitioner argued that the trial Court erred by using the wrong standard, assessing the evidence in Limo's file for its persuasive force rather than its materiality only. "thus the Court admitted there was material Contained in Limo's personnel file, that would have been disclosed prior to trial." But looking back in retrospect thus the trial is over, it's clear the Court's conclusion that the evidence was of such little probative value that (1), it probably would not have been

Did you raise <u>GROUND ONE</u> in the California Supreme Court?
☒ Yes ☐ No.

admitted to begin with, but second of all, it would not have made a difference in the outcome of the defendant's trial. And it would not have raised a reasonable doubt concerning that particular officer's testimony. And though the new trial motion denied, the Court made clear that in determining whether or not to disclose material evidence, he assessed it under the standard for ruling on a motion for new trial on the grounds of ineffective assistance of Counsel. Petitioner was required to show a reasonable probability that, but for Counsel's unprofessional error, the result of the proceeding would have been different, before the trial Court would disclose the evidence inside Lima's file. (R.t. pp. 262-263.) The Appeal, Petitioner argued that the trial Court erred in requiring him to demonstrate "prejudice" in the context of a discovery motion, even though made post-trial the trial Court thus created a "Catch-22" for the Petitioner, because he could not in no way demonstrate the likely effect of "Undisclosed evidence" on the trial outcome. Most significantly, the Court's ruling deprived Petitioner of the opportunity to investigate the Complaints against Lima, as trial Counsel would have been able to do if he had brought a timely "Pitchess" motion. Thus Petitioner was denied the chance to determine if there was other evidence that would have demonstrated sufficient misconduct on the part of detective, Lima to justify a new trial. And thus the Court Conducted an In camera hearing and was transcribed, pages 192 thru 197 was sealed and placed in a separated envelope; examination of both detective "Lima and taloso" personnel records for evidence of "Solicitation of bribes, Complaints of false arrests, allegations of false police reports, and perjury" (R.t. pp. 188-191.) And no Court can say with certainty whether or not given Counsel the opportunity of undisclosed evidence in detective Lima file he would not have been able to raise a reasonable doubt Concerning that particular officer's testimony. Further support in argument with points and authorities See Appendix A pp. 13-15; Appendix B pp. 6-16; C pp. 2-8

(b) **GROUND TWO**: The Appeal Court erred In Elevating the Standard of Review of the Post-Trial *Pitchess* Motion from "Materiality" to "Prejudice"

Supporting FACTS (state *briefly* without citing cases or law): Petitioner was Convicted of Six Counts of bribing and Execution Officer — Mainly — detective *Lima*, (Said) both Lima and Toloso Received Money from him. Second and third occasions, the Officers audiotaped the transaction. (2 C.t. pp. 440-450, 460-470.) Count one, two, the case against petitioner Consisted of the testimony of detective *Lima*. (1 R.t. pp. 23-26.) Similarly, Count three, four (December 7, & 4) were founded upon Lima's testimony that petitioner was involved in the transaction [Via Cell Phone], because petitioner was [N]ot present and his voice did appear on the audiotape. (1 R.t. pp. 27-32; 2 C.t. pp. 438-452.) Count five, six, were founded upon both Lima's testimony and audiotape transaction with petitioner (1 R.t. pp. 38-40; 2 C.t. pp. 453-472.) ("Mind the Court without Audiotape Voice Expert Authentication"). However, **NO** direct Mention of Money paid by petitioner on the tape. thus the *proof* of Bribery depended heavily upon the Context of the Conversation provided by detective *Lima's* testimony. Petitioner's trial Counsel, "*Frank Borillo*," attempted to set up an Entrapment defense. He attacked the credibility of the Officers and *suggested* that they were misrepresenting the events that actually occurred. (1 R.t. pp. 64-79.) Borillo intimated at closing argument that petitioner was en-

Did you raise <u>GROUND TWO</u> in the California Supreme Court?
☒ Yes ☐ No.

trapped by corrupt police who demanded bribes in order to allow his business to continue. However, Barillo never conducted any investigation, nor filed any written discovery motion prior to trial, and thus could not impeach these officers with any prior misconduct that might have eroded their credibility. (1 Rt. pp. 111, 126; 2 Ct. p. 255.) In particular, Barillo did not file a motion for discovery of the personnel records of Detective Limo and tolosa. Following defendant (petitioner) conviction, he required new counsel, "Kristin Erickson." Erickson immediately filed a Pitchess motion in order to uncover information (counsel Barillo failed to do), that would support an argument in a motion for new trial that counsel "Barillo" was ineffective; being petitioner's trial counsel. (2 Ct. pp. 238-259.) This trial court found good cause and examined the personnel records of Limo and tolosa in camera. In its published opinion, "the Court of Appeal" correctly noted that to initiate discovery via a post-trial Pitchess motion, defendant (petitioner) must demonstrate the materiality of the information to the pending litigation, rather to the preceding trial. The pending "litigation" was petitioner's motion for new trial on grounds of ineffective assistance of counsel (As Stated Ground A), based upon former counsel's failure to make a Pitchess motion or otherwise investigate an entrapment defense. To prevail on his motion for new trial, petitioner was required to show a "reasonable probability" that competent performance, i.e., a full investigation and presentation of evidence of Limo's misconduct would have led to a different result — that is, he had to show that counsel's omissions were prejudicial. This reasoning was sound, Appeal Court erred. See Appendix A pp. 10-17

(c) **GROUND THREE:** Appeal Court Erred in finding no Cunningham Violation where the trial Court Imposed Consecutive terms for all Counts Based on factors In Aggravation Not found by the jury Beyond a Reasonable Doubt.

Supporting FACTS (state *briefly* without citing cases or law): The trial Court Sentenced petitioner to the mid-term of three year on Count one, and one-third of the mid-term for each of Counts three and five, one year each, run Consecutively. (C.t. pp. 430-431, R.t. pp. 1062-1063.) In imposing Consecutive Sentences, the trial Court stated that: "the crime charged in count one was committed on November 16, 2004, the crime charged in count three on December 7, 2004 And in count five on January 25, 2005. Although the ultimate goals [sic] of the crimes charged was to keep the police from shutting down his house of ill remuneration [sic], the defendant Committed separate acts of bribery on Separate occasions so as to preclude the Idea that the crimes were Committed during a single period of adonment [sic] behavior." Therefore, the sentence for Counts three and five will be run Consecutive to count one, one-third the mid-term violating P.C. sec. 567 is one year, which hereby is imposed on Counts three and five. the Court apparently relied upon Rule 4.425 (a)(3), which provides as follows: "Criteria affecting the decision to impose consecutive rather than concurrent sentences include, (a) facts relating to the crimes, including whether or not - (3) the crimes were committed at different times or separate places, as to indicate a single period of aberrant behavior." By

**Did you raise GROUND THREE in the California Supreme Court?**

☒ Yes ☐ No.

the trial Court imposting "consecutive" sentences without a jury finding, "Beyond a reasonable doubt," that this factor were indeed, true. the sentence is impermissible petitioner was deprived of [H]is right to a jury trial as to this factor. Further support and Argument with points and Authorities. See Appendix A. pp. 18-24.

///

///

///

///

///

///

///

///

///

///

///

///

///

(d) **GROUND FOUR**: _____

_____

_____

_____

**Supporting FACTS** (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Did you raise GROUND FOUR in the California Supreme Court?**

☐ Yes ☐ No.

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes  ☒ No

24. If your answer to #23 is "Yes," give the following information:

   (a) Name of Court: _____

   (b) Case Number: _____

   (c) Date action filed: _____

   (d) Nature of proceeding: _____

   _____

   (e) Grounds raised: _____

   _____

   _____

   _____

   _____

   (f) Did you receive an evidentiary hearing on your petition, application or motion?
   ☐ Yes  ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

   (a) At preliminary hearing: _____

   _____

   (b) At arraignment and plea: _____

   _____

   (c) At trial: _____

   (d) At sentencing: Frank Barillo ; following Petitioner Conviction: Kristin Erickson, 8502, E. Chapman Ave, #305., Orange, CA 92869

   (e) On appeal: Lise M. Breakey, 5750 Amaya Drive, Unit 8, La. Mesa, California 91942

   (f) In any post-conviction proceeding: Pitchess Motion by Counsel Erickson with trial Court

   (g) On appeal from any adverse ruling in a post-conviction proceeding: _____

   _____

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes  ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes  ☒ No

   (a) If so, give name and location of court that imposed sentence to be served in the future:

   _____

   (b) Give date and length of the future sentence: _____

   _____

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   ☐ Yes  ☐ No

28. Date you are mailing (or handing to a correctional officer) this Petition to this court: _____

_____

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____
SIGNATURE OF ATTORNEY (IF ANY)  *In Pro Per*

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

**11/4/2007**
   (DATE)

_____
SIGNATURE OF PETITIONER
*In Pro Per*

## VERIFICATION

STATE OF CALIFORNIA ) On this day, Listed Court Pleadings Were Given

COUNTY OF IMPERIAL ) To Prison Official For Filing/Mailing

( C.C. P. §446 & 2015.5; 28 U.S.C. §1746

I, JUAN - P - NGUYEN , declare under penalty of perjury that: I am the PARTY in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge except as to matters stated therein upon information and belief, and as to those matters, I believe they are true:

Executed this 4 day of November , 2007 , at Centinela State Prison, P.O. Box 901, Imperial, CA 92251.

[Signature] _____

DECLARANT/PRISONER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PROOF OF SERVICE BY MAIL

( C.C.P. Sec. §1013 (a) & 2015.5; 28 U.S.C. Sec.§1746.)

I, Eugene Hill , am a resident of Centinela State Prison, in the County of Imperial, State of California; I am over the age of eighteen (18) years and am not a party of the above-entitled action. My state prison address is:

Centinela State Prison, P.O. Box 901 , Imperial, CA 92251.

On 11/4 , 2007 , I served the foregoing:

Petition 15 pages Under 28 U.S.C. For Writ of Habeas with Attached Reporter, and Clerk's transcripts, and In addition Appendix A thru E.

(Set forth the exact title of document (s) served.)

on the part (s) herein by placing a true copy (s) thereof, enclosed in a sealed envelope (s), with postage thereon fully paid, in the United States Mail, in a deposit box so provided at Centinela State Prison, P.O.Box 901, Imperial, CA 92251, addresses:

United States District Court, Room 4290 Southern District of California 880 Front Street, San Diego, CA, 92101-8900

Office Of the Attorney General. 110 West "A" Street, Suite 1100. San Diego, Calif. 92101

There is delivery service by United States Mail at the so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/4 , 2007

Eugene Hill

DECLARANT/PRISONER

# Table Of Contents

pages

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
Petition Under 28 U.S.C. § 2254 for Writ of Habeas
Corpus, By A Person In State Custody in pro per. . . . . 1-14
Ground A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . b
Supporting facts. . . . . . . . . . . . . . . . . . . . . . . b-7
Ground B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Supporting facts. . . . . . . . . . . . . . . . . . . . . . . 8-9
Ground C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Supporting facts. . . . . . . . . . . . . . . . . . . . . . . 10-11

Appendix A, B, C, Memorandum with addition
Support and Argument in Support herein with
Points And Authorities. . . . . . . . . . . . . . . . . . Back

Appendix D, Copy of the Supreme Court Denial. . . Back

Appendix E, Copy of Appeal Court Opinion pp. . . 1-27

Reporter And Clerk's transcripts In Support of
Petitioner's facts Attached to Writ of Habeas Corpus. Back

Proof of Service p. . . . . . . . . . . . . . . . . . . . . . . 15

# Introduction

This case arises out of an ongoing investigation of the Happy tanning Salon at 5110 West Seventeenth Street, in Santa Ana, for recurring prostitution-related (said) activities. On four occasions, (said) supplied cash payments to Detective Lima and to Oso, apparently to persuade them to release arrested individuals or to focus police attention on competitive businesses. And this petitioner was convicted of counts one, three and five, to be served each consecutively. And stayed sentence on count two, four, and six pursuant to section 5654 of the P.C. all for bribery. The conviction however, consisted solely of the testimony of one detective Lima; yet because of the trial court "prejudicially erred" in violation of petitioner right to due process, and the ineffective assistance of counsel, by refusing to disclose material evidence (in part of his right to a fair trial) in his post-trial latcless motion, by denying petitioner a new trial, his imprisonment is in violation of the "U.S. Constitution."

Date: 11/4/2007

Respectfully Submitted

/S/ _____

Di the Pre

i

1 R.T. pp. 23-26

Reporter's Transcripts

1 R.t. pp. 23-26

Reporter's transcripts

```
 1          SANTA ANA, CALIFORNIA - WEDNESDAY, OCTOBER 5, 2005

 2                        MORNING SESSION

 3   (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT IN THE

 4   PRESENCE OF THE JURORS:)

 5          THE COURT:  BACK IN THE MATTER OF PEOPLE VERSUS

 6   NGUYEN AND HAU.  ALL PARTICIPANTS ARE PRESENT.  MR. PEAR, YOU

 7   MAY RESUME.

 8          MR. PEAR:  THANK YOU, YOUR HONOR.

 9          Q      INVESTIGATOR LIMA -- EXCUSE ME, DETECTIVE

10   LIMA, WHEN WE WERE -- WHEN WE RECESSED YESTERDAY, I JUST

11   ABOUT HAD CONCLUDED DISCUSSING WITH YOU THE HISTORY OF THE

12   VICE INVESTIGATION AT HAPPY TANNING THAT HAD GONE ON DURING

13   THE PERIOD NINE OR TEN MONTHS OF THE YEAR 2004 UP TO NOVEMBER

14   16TH OF 2004, BUT BEFORE I GET TO NOVEMBER 16TH AND THE

15   ACTIVITIES THAT OCCURRED THAT DAY, WITH REGARDS TO MR. HAU,

16   WAS THERE SOME CONVERSATION THAT YOU HAD WITH HIM BEFORE

17   NOVEMBER OF 2004 REGARDING HIS CONNECTION, IF ANY, WITH HAPPY

18   TANNING?

19          A      YES, SIR.

20          Q      AND WHEN DID THAT OCCUR, IF YOU RECALL?

21          A      IN THE MIDDLE OF MARCH OF 2000 AND 4.

22          Q      AND WHAT WERE THE CIRCUMSTANCES OF THAT

23   CONVERSATION?

24          A      I SPOKE WITH HIM BECAUSE I TOLD HIM WE WERE

25   INVESTIGATING HIM FOR BEING INVOLVED WITH THE HOUSE OF

26   PROSTITUTION.  HE TOLD ME HE WAS THE MANAGER OF THE LOCATION
```

1  AND THAT ACTIVITY WAS NOT OCCURRING THERE.

2          Q     IN YOUR VISITS TO HAPPY TANNING IN THE MONTHS

3  BEFORE NOVEMBER OF 2004, DID YOU ALSO, BESIDES MR. HAU AND

4  MR. TUAN NGUYEN, COME IN CONTACT WITH A MRS. HUONG NGUYEN,

5  H-U-O-N-G?

6          A     YES, SIR.

7          Q     ON APPROXIMATELY HOW MANY OCCASIONS?

8          A     BEFORE NOVEMBER OF 2000 AND 4 I WOULD SAY

9  EASILY FIVE TO TEN DIFFERENT TIMES.

10          Q     WHAT, IF ANY, CONNECTION DID SHE HAVE WITH THE

11  DEFENDANTS OR THE BUSINESS?

12          A     SHE WAS THE HUSBAND OF MR. NGUYEN.

13          Q     OR THE WIFE?

14          A     I'M SORRY, THE WIFE OF MR. NGUYEN AND WAS ALSO

15  INVOLVED IN THE BUSINESS, RUNNING THE BUSINESS, AND SHE ALSO

16  HAD BEEN ARRESTED FOR PROSTITUTION OUT OF THE BUSINESS.

17          Q     AT ANY OF YOUR CONTACTS AT HAPPY TANNING IN

18  THE NINE OR TEN MONTHS BEFORE NOVEMBER THE 16TH OF 2000 AND

19  4, HAD MR. TUAN NGUYEN GIVEN YOU OR OFFERED YOU ANY MONEY AT

20  ANY TIME?

21          A     BEFORE NOVEMBER 16TH, NO, SIR.

22          Q     OR TO ANY OTHER OFFICERS IN YOUR PRESENCE?

23          A     NO, SIR.

24          Q     HAD YOU OR ANY OFFICERS IN YOUR PRESENCE EVER

25  ASKED MR. NGUYEN, PRIOR TO NOVEMBER 16TH OF '04, FOR ANY

26  MONEY OR ANYTHING ELSE OF VALUE?

1        A     NO, SIR.

2        Q     WITH REGARDS TO MR. HAU, BEFORE NOVEMBER THE

3  16TH OF 2000 AND 4, HAD YOU OR ANY OFFICERS IN YOUR PRESENCE

4  RECEIVED ANY MONEY OR THING OF VALUE FROM HIM?

5        A     NO, SIR.

6        Q     HAD YOU OR ANY OFFICER IN YOUR PRESENCE ASKED

7  OR REQUESTED ANY MONEY OR THING OF VALUE FROM MR. HAU?

8        A     NO, SIR.

9        Q     WITH REGARDS TO MRS. NGUYEN IN THE PERIOD

10  BEFORE NOVEMBER 16TH OF '04, HAD YOU OR ANY OFFICERS IN YOUR

11  PRESENCE RECEIVED ANY MONEY OR THING OF VALUE FROM HER?

12        A     NO, SIR.

13        Q     OR REQUESTED ANYTHING OF VALUE FROM HER?

14        A     NO, SIR.

15        Q     IN YOUR VISITS TO HAPPY TANNING IN YOUR

16  INVESTIGATIONS BEFORE NOVEMBER 16TH, '04, HAD YOU LOOKED AT

17  OR SEEN TANNING BEDS OR EQUIPMENT OF THAT NATURE?

18        A     YES, SIR.

19        Q     ON HOW MANY OCCASIONS?

20        A     I WOULD SAY EVERY TIME I ENTERED THE LOCATION,

21  THEY ALWAYS HAD TANNING BEDS THERE.

22        Q     DID YOU ON ANY OF THOSE OCCASIONS OBSERVE ANY

23  OF THOSE BEDS IN OPERATION?

24        A     NOT AT ALL, SIR.

25        Q     DID YOU EVER FIND ANYONE THERE WHO DID OR

26  COULD OPERATE THE TANNING BEDS?

```
 1        A       I DON'T THINK I EVER FOUND ANYONE.  I ASKED,

 2   AND NOBODY KNEW HOW TO OPERATE A TANNING BED, ANY OF THE

 3   GIRLS THAT WORKED THERE.

 4        Q       ON NOVEMBER THE 16TH OF 2000 AND 4 AT

 5   APPROXIMATELY 3:20 IN THE AFTERNOON, WERE YOU AND

 6   INVESTIGATOR TOLOSA AT THE HAPPY TANNING SALON ON WEST 17TH

 7   STREET IN SANTA ANA, ORANGE COUNTY, CALIFORNIA?

 8        A       YES, SIR.

 9        Q       ON THAT DATE AND TIME WAS AN ARREST MADE OF A

10   YOUNG LADY AT THE LOCATION FOR PROSTITUTION?

11        A       YES, SIR.

12        Q       AT SOME TIME AFTER YOU HAD ARRIVED AT THE

13   LOCATION, DID MR. -- DID DEFENDANT TUAN NGUYEN ARRIVE AT

14   HAPPY TANNING?

15        A       YES, SIR.

16        Q       DO YOU RECALL WHEN HE ARRIVED IN RELATIONSHIP

17   TO THE PROSTITUTION ARREST THAT OCCURRED?

18        A       I WOULD SAY AFTER THE ARREST WAS MADE.  HE

19   PROBABLY ARRIVED WITHIN 10 TO 15 MINUTES, NO LATER THAN THAT.

20        Q       AND, IF YOU CAN RECALL, APPROXIMATELY HOW LONG

21   WERE YOU IN HAPPY TANNING BEFORE YOU HAD MADE THE ARREST OR

22   BEFORE THE ARREST WAS MADE?

23        A       WITHIN MOMENTS OF US WALKING IN.  FIVE MINUTES

24   AT THE MOST.

25        Q       AND DO YOU RECALL WHAT, IF ANYTHING, YOU HAD

26   SEEN OR OBSERVED WHEN YOU WALKED IN THAT PRECIPITATED OR
```

1   CAUSED THIS PROSTITUTION ARREST?

2          A      I BELIEVE THE FEMALE NAMED TIFFANY MAI IN THE

3   BACK ROOM WITH ANOTHER GENTLEMAN.  I HAD PREVIOUSLY SEEN HER

4   THERE AND ARRESTED HER FOR LOITERING WITH THE INTENT TO

5   COMMIT PROSTITUTION ACTIVITY.  I TOLD HER IF SHE VIOLATED

6   THIS CRIME AGAIN, SHE WOULD BE ARRESTED.  AT WHICH POINT I

7   PLACED HER UNDER ARREST.

8          Q      WHEN YOU ARRIVED THERE, WAS SHE IN SOME ROOM

9   WITH AN INDIVIDUAL?

10          A      I THINK HE WAS IN ONE OF THE BACK ROOMS, ROOM

11   NUMBER THREE, SIR, ALL THE WAY TO THE BACK.

12          Q      AFTER YOU MADE THE ARREST OF HER, YOU

13   INDICATED TUAN NGUYEN ARRIVED AT THE BUSINESS; IS THAT

14   CORRECT?

15          A      YES, SIR.

16          Q      WHAT HAPPENED UPON HIS ARRIVAL?

17          A      HE WALKED BY SERGEANT IBARRA, WHO WAS AT THE

18   DOORWAY, AND PROCEEDED TO WALK TOWARD MY LOCATION.

19          Q      AND WHAT HAPPENED THEN?

20          A      TUAN NGUYEN TOLD ME I COULD FOLLOW HIM TO THE

21   BACK OF THE LOCATION BECAUSE HE WANTED TO TALK TO ME.

22          Q      DID YOU DO THAT?

23          A      YES, SIR.

24          Q      HE SPOKE WITH YOU IN ENGLISH?

25          A      YES, SIR.

26          Q      AND YOU SPOKE TO HIM IN ENGLISH I'M ASSUMING.

1        A        YES, SIR.

2        Q        WHAT HAPPENED AT THAT POINT?

3        A        MR. TUAN NGUYEN PROCEEDED TO ONCE AGAIN TELL

4    ME TO GIVE HIM A BREAK, THAT HE WOULD MOVE HIS BUSINESS BY

5    TOMORROW.  I TOLD MR. NGUYEN THAT I WAS TIRED OF THAT, AND

6    NO, HE WAS NOT GOING TO GET A BREAK.

7        Q        WHAT HAPPENED THEN?

8        A        MR. NGUYEN TOLD ME IF THE SERGEANT THAT WAS UP

9    BY THE DOORWAY, IF HE WAS OKAY.  I SAID, "YES, HE'S OKAY."

10   AT THAT POINT HE SAID, "WHAT IS YOUR PARTNER'S NAME?"

11                I SAID, "TOLOSA."

12                AT THIS POINT HE TOLD ME, "I NEED YOUR HELP.

13   LAST WEEK TWO ENVELOPES WERE LEFT BEHIND IN MY PLACE."  AND

14   AT THAT TIME HE TOOK THEM OUT OF HIS LEFT PANTS POCKET AND

15   HANDED TWO ENVELOPES TO ME.  HE SAID, "TAKE IT WITH YOU TO

16   THE POLICE DEPARTMENT."  AT WHICH POINT I OPENED THE

17   ENVELOPES AND NOTICED IT WAS $500 IN EACH ENVELOPE, 100

18   DOLLAR BILLS.  AT THAT POINT HE SAID, "NEXT TIME IT WILL BE

19   BETTER.  BUSINESS IS SLOW RIGHT NOW."

20       Q        WHAT HAPPENED THEN?

21       A        AT THAT POINT, SEEING THAT IT WAS TWO

22   ENVELOPES, I CALLED DETECTIVE TOLOSA OVER TO MY LOCATION AND

23   WHERE TUAN NGUYEN AND I WERE TALKING.

24       Q        WHAT HAPPENED THEN?

25       A        I GAVE DETECTIVE TOLOSA THE ENVELOPE THAT

26   BELONGED TO HIM, AT WHICH POINT TUAN NGUYEN REPEATED THE SAME

1    STORY, THAT HE HAD FOUND THESE ENVELOPES AND WANTED US TO

2    HAVE THEM AND TAKE THEM TO THE POLICE DEPARTMENT, AND TOLD,

3    US, ONCE AGAIN, THAT BUSINESS WAS SLOW AND THAT IT WOULD BE

4    BETTER NEXT TIME.  HE SAID THAT ON THREE DIFFERENT OCCASIONS.

5        Q        DID YOU HAVE SOME CONVERSATION WITH MR. NGUYEN

6    AT THAT TIME ABOUT THE LADY WHO HAD BEEN ARRESTED?

7        A        YES, SIR.

8        Q        AND WHAT WAS THAT?

9        A        I TOLD HIM THAT SERGEANT IBARRA WAS HERE

10   ALREADY, AND SHE HAD TO GO TO JAIL, BUT I WAS GOING TO SEE IF

11   I COULD CITE HER OUT WITH A CITATION, BUT SHE WAS STILL GOING

12   TO HAVE TO GO TO JAIL THAT DAY.  AND MR. TUAN NGUYEN SAID,

13   "THAT'S FINE.  THANK YOU."

14       Q        AND DID YOU AND TOLOSA LEAVE THE BUSINESS?

15       A        YES, SIR.

16       Q        WITH THE $1,000?

17       A        YES, SIR.

18       Q        WHAT WAS DONE WITH THAT MONEY?

19       A        I BELIEVE DETECTIVE TOLOSA BOOKED THAT MONEY

20   INTO EVIDENCE.

21       Q        FOLLOWING THAT INCIDENT, DID YOU CONTACT OR

22   SPEAK WITH A DEPUTY DISTRICT ATTORNEY IN ORANGE COUNTY

23   REGARDING WHAT HAD OCCURRED?

24       A        YES, SIR.

25       Q        DO YOU RECALL WHO THAT WAS?

26       A        YES, SIR.

1 R.t. pp. 38-40

Reporter transcripts

1 R.t. pp. 38-40

Reporter transcripts

1       THE COURT:  IF YOU WOULD ALL PASS YOUR TRANSCRIPTS TO

2   THE RIGHT, PLEASE, FOR COLLECTION.

3       MR. PEAR:  WAS THE COURT ANTICIPATING A MORNING

4   BREAK, YOUR HONOR?

5       THE COURT:  EVENTUALLY.  WE'VE ONLY BEEN AT IT FOR 45

6   MINUTES.

7       Q BY MR. PEAR:  DETECTIVE LIMA, FOLLOWING THE 12-7

8   INCIDENT, WAS THAT MONEY, THE THOUSAND DOLLARS BOOKED INTO

9   EVIDENCE AT THE POLICE DEPARTMENT, TOO?

10      A     YES, SIR.

11      Q     FROM THE PERIOD FROM DECEMBER 7 THROUGH

12  JANUARY 6 DID YOU RECEIVE SOME ADDITIONAL PHONE CALLS FROM

13  THE DEFENDANT, TUAN NGUYEN?

14      A     YES, SIR.

15      Q     ON JANUARY 7TH DID YOU ALSO HAVE A PHONE

16  CONVERSATION WITH HIM?

17      A     THAT'S CORRECT.

18      Q     WITH REGARDS TO THAT JANUARY 7TH CONVERSATION,

19  DO YOU RECALL THE SUBJECT MATTER OF THE CONVERSATION?

20      A     I BELIEVE MR. TUAN NGUYEN HAD ASKED ME THAT --

21  HE HAD BEEN CALLING ME OVER THREE TIMES.  HE WAS WONDERING IF

22  I WAS ON VACATION, WHERE I WAS AT, AND WE ALSO DISCUSSED THAT

23  IF HE WASN'T AT THE BUSINESS WHEN WE WENT BACK, THE MONEY

24  WOULD BE THERE FOR TOLOSA AND I.

25      Q     ON JANUARY 25TH OF THIS YEAR, 2005, DID YOU

26  AND INVESTIGATOR TOLOSA RETURN TO THE HAPPY TANNING SALON ON

1    WEST 17TH IN SANTA ANA, ORANGE COUNTY?

2          A      YES, SIR.

3          Q      ON THAT DATE WAS THE CONTACT YOU HAD WITH THE

4    INDIVIDUALS THERE RECORDED SIMILAR TO THE RECORDING YOU MADE

5    OF THE DECEMBER 7TH --

6          A      YES, SIR.

7          Q      -- VISIT?

8                 WHEN YOU ARRIVED AT THE LOCATION ON THE 25TH,

9    WAS TOLOSA WITH YOU AGAIN?

10         A      THAT'S CORRECT.

11         Q      WERE ANY OF THE DEFENDANTS PRESENT AT HAPPY

12   TANNING WHEN YOU ARRIVED?

13         A      I BELIEVE AS WE ENTERED MR. TUAN NGUYEN WAS IN

14   THE SAME AREA, AND HE ENTERED ALMOST AT THE SAME TIME WE DID

15   AS WELL.

16         Q      WHAT HAPPENED THEN?

17         A      WE WENT -- HE TOOK US TO THE BACK ROOM, THE

18   FIRST ROOM WHEN YOU ENTER ON YOUR LEFT SIDE, AND HE PROCEEDED

19   TO GIVE US THE MONEY.  HE GAVE THE ENVELOPES TO MYSELF AND

20   DETECTIVE TOLOSA.

21         Q      WHEN YOU SAY HE GAVE YOU THE ENVELOPES, WERE

22   THERE TWO ENVELOPES?

23         A      YES, SIR, THERE WERE TWO INDIVIDUAL ENVELOPES,

24   AND EACH ONE I BELIEVE HAD $1,500 IN EACH, EACH ONE, HUNDRED

25   DOLLARS BILLS.

26         Q      TO WHOM DID HE -- HE, TUAN NGUYEN, GIVE THE

1    ENVELOPES?

2         A    I BELIEVE IT WAS ONE EACH TO ONE OF EACH,

3    TOLOSA AND MYSELF.

4         Q    AND DID YOU HAVE SOME CONVERSATION WITH

5    MR. NGUYEN ON THAT DATE AT HAPPY TANNING?

6         A    YES, SIR.

7         Q    DO YOU RECALL THE SUBSTANCE OF IT?

8         A    IT WAS REGARDING HIM WANTING FOR US TO TAKE

9    CARE OF HIS COMPETITION, OTHER MASSAGE PARLORS, PROSTITUTION

10   LOCATIONS IN ANAHEIM AND GARDEN GROVE AREA.  I BELIEVE TOLOSA

11   OR MYSELF MIGHT HAVE ASKED HIM, "WHAT DO YOU WANT US TO DO

12   WITH THEM, SHOOT THEM?"

13             I THINK HIS RESPONSE MIGHT HAVE BEEN:  "NO.  I

14   JUST WANT YOU TO SCARE THEM."

15        MR. PEAR:  I WOULD ASK TO HAVE MARKED AS PEOPLE'S TWO

16   FOR IDENTIFICATION AN EVIDENCE ENVELOPE CONTAINING A COMPACT

17   DISC RELATING TO THE JANUARY 25TH TRANSACTION.

18        THE COURT:  SO MARKED.

19        MR. PEAR:  I'LL SHOW IT TO COUNSEL.  MAY I APPROACH

20   THE WITNESS?

21        THE COURT:  YOU MAY.

22        Q BY MR. PEAR:  DETECTIVE, SHOWING YOU WHAT'S BEEN

23   MARKED AS EXHIBIT TWO FOR IDENTIFICATION -- LET ME INTERRUPT

24   MYSELF AT THIS POINT AND MOVE THAT EXHIBIT ONE BE RECEIVED IN

25   EVIDENCE.

26        THE COURT:  ANY OBJECTION?

1 R.t. pp. 64-79

Reporter transcripts

1 R.t. pp. 64-79

Reporter transcripts

1                    ^CROSS-EXAMINATION

2     BY MR. PHAM:

3          Q      GOOD AFTERNOON, DETECTIVE LIMA.

4          A      YES, SIR.

5          Q      HOW LONG HAD YOU BEEN DOING THE INVESTIGATION

6     OF THE TANNING SALON PRIOR TO MAKING THE FIRST ARREST OF THE

7     PEOPLE FROM THAT PARTICULAR PREMISES?

8          THE COURT:  I'M SORRY, ARE YOU ASKING ABOUT WHEN HE

9     ARRESTED ANY OF THE GIRLS OR WHEN HE ARRESTED EITHER OF THE

10    DEFENDANTS?

11         MR. PHAM:  THE FIRST ARREST OF ANYONE FROM THE

12    PREMISES, YOUR HONOR.

13         THE WITNESS:  THE INVESTIGATION OF HAPPY TANNING HAS

14    BEEN ONGOING SINCE 1997 OR '98.  I WAS INVOLVED WITH MY FIRST

15    ARREST PERHAPS IN 2000 AND 1 SOMETIME.

16         Q BY MR. PHAM:  IS IT TRUE THAT BACK ON ABOUT

17    NOVEMBER 16TH THAT WAS THE FIRST TIME YOU HAD RECEIVED THE

18    MONEY FROM SOMEONE FROM THAT PARTICULAR PREMISES; IS THAT

19    CORRECT?

20         A      I'M SORRY, CAN YOU REPEAT THE QUESTION.

21         Q      IS IT TRUE THAT SOMEWHERE BETWEEN -- BEFORE

22    NOVEMBER OF 2000 AND 4TH THERE HAD NEVER BEEN ANY MONEY

23    EXCHANGED OR GIVEN TO YOU FROM ANYONE FROM THAT PARTICULAR

24    TANNING PREMISES; IS THAT CORRECT?

25         A      THAT'S CORRECT.

26         Q      YOU TESTIFIED EARLIER ON THAT WITHIN THE SPAN

1   OF ABOUT NINE MONTHS YOU MADE A TOTAL OF ABOUT 16 ARRESTS; IS

2   THAT CORRECT, SIR?

3           A       WITHIN TEN MONTHS, 16 ARRESTS, THAT'S CORRECT.

4           Q       CAN YOU TELL ME WHY YOU DID NOT CLOSE THAT

5   PLACE AFTER HAVING MADE 16 ARRESTS?

6           A       I'M SORRY, SIR, CAN I TELL YOU WHAT?

7           Q       WHY DIDN'T YOU REQUEST TO HAVE THAT PLACE

8   CLOSED DOWN AFTER YOU HAD MADE 16 ARRESTS?

9           A       OH, WE'VE BEEN ATTEMPTING TO DO THAT, SIR,

10  SINCE 1997 VIA RED LIGHT ABATEMENT LETTERS TO THE OWNERS OF

11  THE BUSINESS OF HAPPY TANNING, SO IT'S BEEN GOING ON NONSTOP.

12          Q       WHY DIDN'T YOU SEEK AN ORDER TO CLOSE DOWN

13  THAT PLACE AFTER YOU HAD MADE 16 ARRESTS?  THAT IS MY

14  QUESTION.

15          A       I'M NOT A LAWYER.  THAT'S THE CITY ATTORNEY'S

16  JOB.  LIKE I SAID, WE SENT MANY, MANY LETTERS TO OWNERS OF

17  THE HAPPY TANNING AND THE ACTUAL PROPERTY OWNER REGARDING RED

18  LIGHT ABATEMENT IF IT CONTINUED.  LIKE I SAID, THAT HAPPENED

19  MANY, MANY TIMES SINCE 1997 TO THIS DATE.

20          Q       AFTER YOU MADE THOSE ARRESTS -- DID YOU HAVE

21  ANY WARRANT PRIOR TO ENTERING THE SUBJECT PREMISES TO MAKE

22  ARRESTS?

23          MR. PEAR:  OBJECTION; RELEVANCE.

24          THE COURT:  SUSTAINED.

25          Q BY MR. PHAM:  DETECTIVE LIMA, DID YOU MAKE A REPORT

26  BACK ON OR ABOUT MARCH -- MARCH 30TH OF THIS YEAR?  IT

1    CONSIST OF SEVEN PAGES PERTAINING TO THE ACTIVITIES GOING ON

2    AT THE PREMISES FROM ABOUT 19 -- FROM ABOUT OCTOBER -- STRIKE

3    THAT.  FROM NOVEMBER 16 THROUGH MARCH 10?

4         A     I'M SORRY, SIR, YOU LOST ME A LITTLE BIT.  IF

5    I CAN ANSWER SOME OF YOUR QUESTION YES, I DID MAKE A REPORT

6    REGARDING THE INCIDENTS FROM NOVEMBER TO MARCH 10TH.

7         MR. PHAM:  MAY I APPROACH THE WITNESS TO SHOW HIM THE

8    ACTUAL REPORT TO MAKE SURE WE ARE TALKING ABOUT THE SAME

9    REPORT HERE, YOUR HONOR?

10        THE COURT:  YES.

11        THE WITNESS:  YES.

12        Q BY MR. PHAM:  DO YOU SPEAK VIETNAMESE?

13        A     NO, SIR.

14        Q     DO YOU UNDERSTAND VIETNAMESE?

15        A     NO, SIR.

16        Q     DO YOU HAPPEN TO HAVE WITHIN YOUR POSSESSION

17   AT THIS TIME A COPY OF THE POLICE REPORT THAT I SHOWED TO

18   YOU?

19        A     YES, SIR.

20        Q     I WOULD LIKE TO POINT YOUR ATTENTION TO PAGE

21   NUMBER SIX, PLEASE.

22        THE WITNESS:  MAY I, YOUR HONOR?

23        THE COURT:  YES.

24        THE WITNESS:  OKAY, SIR.

25        Q BY MR. PHAM:  ON THE FIFTH PARAGRAPH STARTING ON

26   THE THIRD LINE, COULD YOU PLEASE READ TO THE -- OUT LOUD SO

1    THAT WE CAN ALL HEAR STARTING FROM THE WORD "I.  "I CALLED

2    SUSPECT NUMBER TWO, MR. NGUYEN."  COULD YOU, PLEASE,

3    DETECTIVE LIMA.

4          A      YES, SIR.  HOW FAR DO YOU WANT ME TO READ INTO

5    IT?

6          Q      JUST FROM THE THIRD LINE I HAD JUST INSTRUCTED

7    TO THE END OF THE PARAGRAPH.

8          A      YES, SIR.  "I CALLED SUSPECT NUMBER TWO,

9    NGUYEN, OVER TO HAU, AND HAU TOLD HER IN VIETNAMESE, 'I PUT

10   THAT THERE, AND HE DID NOT WANT TO TAKE IT.'  AFTER LOOKING

11   INSIDE THE ENVELOPE, INVESTIGATOR TOLOSA AND I COUNTED A

12   TOTAL OF $2,000.  SUSPECT NUMBER TWO, NGUYEN, MADE ANOTHER

13   PHONE CALL, AND THEY SAID THEY HAD FORGOTTEN ANOTHER

14   ENVELOPE."

15         Q      SO MR. -- IS THAT MR. NGUYEN OR MISS NGUYEN?

16         A      UH, THAT'S MRS. NGUYEN.

17         Q      MRS. NGUYEN.  IS THAT RIGHT, MRS. NGUYEN?

18         A      THAT'S CORRECT, SIR.

19         Q      AND HOW IN VIETNAMESE, QUOTE, UNQUOTE, "I PUT

20   THAT THERE, AND HE DIDN'T WANT TO TAKE IT"?

21         A      THAT'S CORRECT.  THAT'S WHAT HE SAID.

22         Q      HE SAID THAT IN ENGLISH?

23         A      NO, NO.  IN VIETNAMESE, SIR.

24         Q      DID YOU HAVE SOMEONE DO THE TRANSLATION FOR

25   YOU AT THAT TIME?

26         A      YES, SIR.  A COURT CERTIFIED PERSON BY THE

1  NAME OF DAT NGUYEN THAT WORKS IN OUR AGENCY, HE TRANSLATED

2  THAT FOR ME.

3         Q     SO MR. HAU SPOKE IN VIETNAMESE AT THE

4  PREMISES, AND THEN YOU -- I WONDER HOW -- WAS THE TRANSLATOR

5  THERE AT THAT TIME ON THE PREMISES AND DO THE TRANSLATION FOR

6  YOU RIGHT THERE AND THEN?

7         A     NO, SIR.  YOU RECALL THE TAPES THAT WERE

8  PLAYED EARLIER.  I HAVE THOSE TAPES.  I PLAYED THAT TO THE

9  COURT CERTIFIED TRANSLATOR, WHO LISTENED TO THEM AT A LATER

10  TIME.

11         Q     IS IT TRUE THAT YOU INDICATE THAT YOU HAVE

12  SEEN MR. HAU ON THE PREMISES ON NUMEROUS OCCASIONS?

13         A     FROM WHICH TIME, SIR?

14         Q     CAN YOU TELL ME, SIR, HOW MANY TIMES HAVE YOU

15  ACTUALLY SEEN MR. -- STRIKE THAT.

16               HOW MANY TIMES HAVE YOU ACTUALLY SPOKEN TO

17  MR. HAU?

18         A     SEVERAL TIMES, SIR.

19         Q     WAS THAT JUST BASICALLY INVOLVED GREETINGS,

20  SUCH AS "HELLO, HOW ARE YOU DOING?"  ANYTHING BESIDES THAT

21  NORMAL GREETING?

22         A     YES, SIR.  I SPOKE WITH HIM AS FAR BACK AS

23  MARCH OF 2004 WHEN HE TOLD ME HE WAS RUNNING THE BUSINESS, TO

24  JUST SIMPLE "HELLOS," TO "I'M GONNA CALL TONY FOR YOU, DON'T

25  WORRY." TO "HERE'S THE MONEY.  THERE'S TWO IN HERE, AND

26  THERE'S TWO MORE NEXT TIME."

```
 1        Q        DO YOU KNOW MR. HAU'S CAPACITY AT THE TANNING

 2   SALON?

 3        A        DO I KNOW HIS WHAT?  I'M SORRY, SIR?

 4        Q        HIS POSITION THERE.

 5        A        I WOULD CONSIDER -- ARE YOU ASKING ME OR DO I

 6   KNOW?

 7        Q        DO YOU KNOW?

 8        A        I BELIEVE HE'S THE MANAGER, SIR.  HE RUNS THE

 9   BUSINESS ALONG WITH MR. TUAN NGUYEN.

10        Q        WHEN YOU SAY HE RUNS THE BUSINESS, IS HE

11   EMPLOYED THERE, OR HE ACTUALLY IS THE OWNER OR THE PERSON

12   THAT RUNS THE PLACE?  CAN YOU CLARIFY THAT?

13        A        YES.  MR. TUAN NGUYEN AND MR. HAU HAVE BEEN IN

14   BUSINESS RUNNING THIS PLACE FOR A VERY LONG TIME.  THERE IS

15   ACTUALLY NO EMPLOYEE PEOPLE WORKING THERE.  AND I FOUND THIS

16   OUT THROUGH I BELIEVE THE EQUAL OPPORTUNITY EMPLOYMENT.  THEY

17   TOLD ME THAT THERE'S NO ONE THAT ACTUALLY IS WORKING THERE,

18   SO THAT'S WHY I KNOW THAT.

19        Q        BESIDES THE INFORMATION YOU HAD JUST PROVIDED,

20   DO YOU KNOW WHETHER OR NOT MR. HAU ACTUALLY IS EMPLOYED THERE

21   OR HE IS THE EMPLOYER OR HE IS THE EMPLOYEE AT THAT

22   PARTICULAR PLACE, INDEPENDENTLY?

23        A        I'M SORRY, SIR, CAN YOU REPEAT THAT AGAIN?

24        Q        INDEPENDENTLY DO YOU KNOW WHAT MR. HAU'S

25   ACTUAL CAPACITY IS AT THAT PARTICULAR PLACE?

26        A        HE'S RUNNING THE PLACE JUST LIKE MR. TUAN
```

1    NGUYEN IS, SIR.

2         Q      AND BASED ON WHAT INFORMATION?

3         A      THE INFORMATION THAT WE'VE DONE SURVEILLANCES

4    ON HIM, DRIVING THE GIRLS FROM THE PLACE TO ANOTHER LOCATION.

5    HE PICKS UP FOOD FOR THE GIRLS.  HE'S ALWAYS THERE THE

6    MAJORITY OF THE TIMES THAT WE SHOW UP, AND HE ALSO COLLECTS

7    MONEY FOR THE GIRLS WHEN CUSTOMERS COME IN.

8         Q      WERE YOU THERE WHEN HE COLLECTED MONEY FOR THE

9    GIRLS?

10        A      YES, SIR.  I WALKED IN SHORTLY THEREAFTER.

11        Q      DOES HE APPEAR TO BE RUNNING THE PLACE OR HE

12   IS ACTUALLY DOING IT AT THE COMMAND OF A THIRD PARTY?

13        A      NO.  I THINK TUAN NGUYEN AND HAU ARE BOTH

14   RUNNING THE PLACE.  I DON'T THINK ANYBODY IS COMMANDING

15   ANYBODY TO DO ANYTHING.

16        Q      YOUR TESTIMONY EARLY ON THAT AFTER -- STRIKE

17   THAT.

18               DO YOU RECALL HAVING STATED THAT AFTER -- ON

19   ONE OCCASION AFTER HAVING SPOKEN TO MRS. NGUYEN, AND THEN YOU

20   INDICATED THAT MRS. NGUYEN THEN MADE A PHONE CALL, AND THEN A

21   FEW MINUTES LATER MR. HAU APPEARED, DO YOU RECALL THAT?

22        A      WHICH TIME, SIR?

23        Q      DO YOU RECALL THE TIME WHEN -- WAS THERE MORE

24   THAN ONE OCCASION WHEN, AFTER MRS. NGUYEN MADE A PHONE CALL,

25   THAT MR. HAU APPEARED AND TALKED TO YOU?  WAS THAT ON MORE

26   THAN ONE OCCASION?

1    A    I DON'T RECALL, SIR.  I'M WONDERING WHICH

2  TIME.  THERE'S DIFFERENT DATES AND TIMES, SO IF YOU COULD

3  NARROW IT DOWN A LITTLE BIT FOR ME, SIR.

4    Q    DO YOU RECALL HAVING TESTIFIED AT ONE TIME YOU

5  SAW MR. HAU CAME IN A FEW MINUTES LATER THROUGH THE BACK

6  DOOR, AND YOU FOLLOW HIM, DO YOU RECALL THAT?

7    A    IS THAT THE TIME HE GAVE ME THE MONEY, SIR?

8  ON MARCH 10TH?

9    Q    THAT WOULD BE ON THE OCCASION OF MARCH 10TH,

10  THAT IS CORRECT.

11    A    YES, I RECALL THAT.

12    Q    SO IS IT TRUE THAT YOU TESTIFIED EARLY ON WHEN

13  YOU WENT TO THAT PARTICULAR HAPPY TANNING AND YOU FOUND

14  MRS. -- AND YOU FOUND MRS. NGUYEN ASLEEP ON THE FLOOR, YOU

15  WOKE HER UP, AND THEN SHE MAKE A PHONE CALL, DO YOU REMEMBER

16  THAT?

17    A    YES, SIR.

18    Q    AND THEN ACCORDING TO YOU AS WELL

19  SUBSEQUENTLY -- OR A FEW MINUTES LATER MR. HAU SHOWED UP; IS

20  THAT CORRECT?

21    A    THAT'S CORRECT.

22    Q    DO YOU KNOW WHETHER OR NOT TO WHOM THE PHONE

23  CALL WAS MADE BY MRS. NGUYEN AT THAT TIME?

24    A    NO, SIR.

25    Q    WAS THERE ANY ONE PARTICULAR TIME THAT MR. HAU

26  ACTUALLY HANDED MONEY TO YOU?

1      A       YES, SIR.  LIKE I STATED, HE HANDED ME THE

2   MONEY ON MARCH THE 10TH.  WHEN HE CAME BACK THE SECOND TIME,

3   HE HANDED ME THE ENVELOPE THAT CONTAINED $2,000, AND THAT'S

4   WHEN HE SAID, "HERE'S TWO MORE.  TWO MORE NEXT TIME," OR

5   SOMETHING TO THAT EFFECT.

6      Q       DID HE ASK YOU -- IN EXCHANGE FOR THE MONEY,

7   DID HE ASK YOU NOT TO EVER RETURN OR NOT TO BOTHER THE GIRLS

8   THERE AT THE TANNING SALON?

9      A       NO, SIR.

10     Q       DID HE -- STRIKE THAT.

11             AT THE TIME WHEN HE, ACCORDING TO YOU, HANDED

12  YOU THE CHECK -- I MEAN, THE ENVELOPE CONTAINING THE 2000,

13  DID HE TELL YOU THAT THE MONEY WAS BEING GIVEN TO YOU SO THAT

14  YOU WOULD NOT BE MAKING ANY MORE ARRESTS OF THE GIRLS THERE?

15     A       CAN YOU REPEAT THE QUESTION.

16     Q       WHEN HE ALLEGEDLY HANDED YOU AN ENVELOPE

17  CONTAINING $2,000 INSIDE THE ENVELOPE, DID HE ASK YOU TO NOT

18  MAKE ANY MORE ARRESTS OF THE GIRLS AT THE SUBJECT PREMISES?

19     A       NO, SIR.  HE JUST SAID, "HERE'S TWO MORE,"

20  MEANING $2,000, AND "THERE WILL BE TWO MORE NEXT TIME."

21         MR. PHAM:  MOVE TO STRIKE THE REMAINING, ANYTHING

22  AFTER THE WORD "NO," YOUR HONOR.

23         THE COURT:  "NO" WILL REMAIN.  EVERYTHING ELSE WILL

24  BE STRICKEN.  THE JURY IS ORDERED TO DISREGARD IT.

25         Q BY MR. PHAM:  DID MR. HAU AT THE TIME WHEN HE

26  ALLEGEDLY HANDED YOU $2,000 IN AN ENVELOPE, DID HE ASK YOU

1    NOT TO BOTHER THEM AND TO FURTHER PROVIDE PROTECTION FOR

2    THEM?

3          A     NO, SIR.

4          Q     DID MR. HAU EVER MAKE ANY PHONE CALL TO YOU

5    THROUGHOUT 2004, 2005?

6          A     DID HE EVER CALL ME?

7          Q     THAT WAS THE QUESTION, SIR.

8          A     NO, SIR.

9          Q     EVERY TIME WHEN YOU MADE THE VISIT TO THE

10   HAPPY TANNING OR TANNING SALON, IS IT TRUE THAT THE ONE THAT

11   YOU WANT TO TALK TO IS ALWAYS SOMEONE DIFFERENT OR SOMEONE

12   OTHER THAN MR. HAU; IS THAT CORRECT?

13         A     YES, SIR, I BELIEVE SO.

14         Q     HOW IS MR. HAU'S ENGLISH?

15         A     I DON'T UNDERSTAND YOUR QUESTION, SIR.

16         Q     HOW'S HIS ENGLISH COMPARED TO -- THE FLUENCY?

17         A     I CAN'T READILY GRADE IT.  I CAN COMMUNICATE

18   WITH HIM, IF THAT'S WHAT YOU'RE ASKING.

19         Q     ON THOSE OCCASIONS THAT YOU HAVE ACTUALLY

20   SPOKEN TO MR. HAU, WAS THERE ANY ONE TIME MR. HAU DISCUSS --

21   DISCUSS WITH YOU ABOUT THE PROSPECT OF -- ABOUT THE ISSUE OF

22   GIVING YOU MONEY SO THAT YOU MAY PROVIDE EITHER PROTECTION

23   FOR THEM OR THAT YOU MAY STOP MAKING ARRESTS OF THE GIRLS?

24   ANY OF THOSE ISSUES DISCUSSED BETWEEN YOU AND MR. HAU?

25         A     NO, SIR.

26         Q     DID MR. HAU EVER TAKE THE INITIATIVE OF JUST

1  HANDING OVER THE MONEY TO YOU WHEN YOU GREETED HIM ON ALL OF

2  THOSE OCCASIONS?

3        A      I WOULD SAY THE LAST TIME, SIR, HE CAME,

4  OPENED THE DOOR TO THE BUSINESS WHEN HE CAME IN THE SECOND

5  TIME AND JUST HANDED ME THE MONEY AND SAID, "HERE'S TWO, AND

6  THE NEXT TIME IT WILL BE BETTER.  IT WILL BE TWO MORE."

7  NOBODY WAS THERE TELLING HIM TO COME TO ME, SO --

8        Q      AND THAT TIME HOW LONG WAS -- THE TIME THAT

9  YOU SAID THAT HE HANDED THE MONEY TO YOU, HOW FAR WAS -- DID

10 THE TIME ELAPSE THE FIRST TIME WHEN HE GAVE THE 2000 TO YOU,

11 WHICH, ACCORDING TO YOU, HE LEFT ON THE TABLE STAND -- THE

12 NIGHTSTAND, BETWEEN THAT TIME AND THE PERIOD YOU SAID HE

13 REENTERED THE ROOM AND HANDED YOU $2,000, WHAT IS THE TIME

14 FRAME?

15       A      I WOULD SAY ABOUT 20 MINUTES.

16       Q      SO THE FIRST THING THAT HAPPENED WHEN HE DID

17 THAT AT THE INSTRUCTION OF A THIRD PARTY AND THEN 20 MINUTES

18 LATER HE JUST CAME AND HANDED YOU THE SECOND ENVELOPE; IS

19 THAT CORRECT?

20       A      CAN YOU REPEAT THAT AGAIN.

21       Q      THE FIRST TIME HE DID NOT TAKE THE INITIATIVE.

22 HE WAS CALLED IN TO HAND YOU OR TO HAND OVER THE ENVELOPE AND

23 PUT ON THE TABLE OR THE NIGHTSTAND, AND THEN 20 MINUTES

24 LATER, THAT WAS THE FIRST TIME WHEN HE REENTERED THE

25 BUILDING, HE CONTINUED -- HE HANDED YOU ANOTHER ENVELOPE FOR

26 2000; IS THAT CORRECT?

1     MR. PEAR:  OBJECTION; ASSUMES FACTS NOT IN EVIDENCE.

2     THE COURT:  SUSTAINED.

3     Q BY MR. PHAM:  IS IT TRUE THAT THE FIRST TIME THAT

4  HE -- ACCORDING TO YOU, THAT HE HANDED YOU THE MONEY WITHOUT

5  DIRECT INSTRUCTION FROM ANYONE WAS THE LAST TIME THAT HE

6  HANDED YOU $2,000; IS THAT CORRECT?

7     MR. PEAR:  OBJECTION; CALLS FOR A CONCLUSION.

8     THE COURT:  SUSTAINED.

9     MR. PEAR:  AND NO FOUNDATION.

10     MR. PHAM:  YOUR HONOR, I JUST WANT TO VERIFY THE

11  WITNESS' LAST TIME, YOUR HONOR.

12     THE COURT:  YOU'RE ASKING HIM IN HIS OPINION IF

13  SOMEBODY GAVE HIM DIRECTION TO GIVE HIM THE MONEY, AND I

14  DON'T THINK THIS WITNESS IS QUALIFIED TO MAKE THAT

15  PROGNOSTICATION.

16     Q BY MR. PHAM:  IS IT TRUE THAT, ACCORDING TO YOU,

17  THE ONLY ONE TIME, TO YOUR KNOWLEDGE, THAT MR. HAU MADE THE

18  INITIATIVE OF HANDING OVER THE MONEY TO YOU WAS THE VERY LAST

19  TIME; IS THAT CORRECT?

20     A     THE VERY LAST TIME ON MARCH 10, SIR?

21     Q     DID MR. HAU HAND YOU SOME OTHER -- SOME MORE

22  MONEY AFTER THAT DATE?

23     A     NO.  I'M JUST TRYING TO CLARIFY EXACTLY WHAT

24  WE'RE TALKING ABOUT.  THAT WAS -- THE SECOND TIME WAS THE

25  LAST TIME, YES.

26     Q     AND THE TIME THAT HAPPENED BEFORE, THAT WAS

1   JUST ABOUT 20 MINUTES BEFORE THE VERY LAST TIME; IS THAT

2   CORRECT, SIR?

3          A       THAT'S CORRECT.   WHERE HE WALKED INTO THE

4   LOCATION AND TOOK MONEY OUT OF HIS WAISTBAND, REAR WAISTBAND

5   AREA, YES, SIR.

6          Q       AND AT THAT TIME HE WAS CALLED BY A THIRD

7   PARTY THAT YOU SAW; IS THAT CORRECT, SIR?

8          MR. PEAR:  OBJECTION; NO FOUNDATION.

9          THE COURT:  SUSTAINED.

10   Q BY MR. PHAM:  SO PRIOR TO THE VERY LAST TIME,

11   ACCORDING TO YOU -- I JUST WANT TO HAVE SOME CLARIFICATION

12   WHETHER, AGAIN, WHEN YOU WENT ON MARCH 10 OF 2000 AND 5 ONTO

13   THE PREMISES, YOU FOUND MRS. NGUYEN ASLEEP ON THE FLOOR; IS

14   THAT CORRECT?

15          A       THAT'S CORRECT.

16          Q       AND THEN -- DID YOU SEE MR. HAU AT THAT TIME

17   WHEN YOU FIRST ENTERED THE SUBJECT BUILDING?

18          A       I DON'T BELIEVE SO.

19          Q       WAS HE INSIDE THE SUBJECT BUILDING?

20          A       I DON'T BELIEVE SO, BUT IF I CAN LOOK IN MY

21   REPORT, I COULD REFRESH MY MEMORY.

22          Q       YOU MAY, SIR.

23          THE COURT:  GO AHEAD.

24          THE WITNESS:  OKAY, SIR.

25          Q BY MR. PHAM:  UPON YOUR ENTRY OF THE SUBJECT

26   BUILDING, BESIDES HAVING SEEN MRS. NGUYEN RESTING ON THE

1    FLOOR, DID YOU SEE MR. HAU ON THE PREMISES AT THAT TIME?

2          A      NO, SIR.

3          Q      AND THEN IS IT TRUE THAT AT THAT TIME YOU WOKE

4    MRS. NGUYEN UP AND THEN SHE MAKES A PHONE CALL; IS THAT

5    CORRECT?

6          A      THAT'S CORRECT.

7          Q      AND THEN A FEW MINUTES LATER AFTER THE PHONE

8    CALL WAS MADE THEN YOU SAW MR. HAU COMING -- COMING ONTO THE

9    PREMISES; IS THAT CORRECT?

10         A      THAT'S CORRECT.

11         Q      AND THEN WITHIN SHORTLY THEREAFTER MR. HAU,

12   ACCORDING TO YOUR WORDS -- AND IF I'M WRONG PLEASE CORRECT

13   ME -- PUT THE MONEY ON -- ON THE NIGHTSTAND; IS THAT CORRECT?

14         A      YES, SIR.  HE TOOK IT OUT OF HIS REAR

15   WAISTBAND AREA, AND HE STARTED TO PUT IT IN THE NIGHTSTAND

16   AREA WHEN I SURPRISED HIM.

17         Q      ALL RIGHT.  AND THEN 20 MINUTES LATER --

18   STRIKE THAT.

19                AFTER THAT DID YOU SEE HIM LEAVING THE

20   PREMISES?

21         A      UH, HE STAYED AROUND FOR A FEW MINUTES.

22         Q      BUT THEN HE LEFT THE PREMISES; IS THAT

23   CORRECT?

24         A      THAT'S CORRECT.

25         Q      AND THEN ABOUT 15 TO 20 MINUTES LATER HE

26   RETURNED?

1          A       THAT'S CORRECT.

2          Q       AND THAT'S THE TIME WHEN -- ACCORDING TO YOU,

3    THAT WAS THE FIRST TIME HE EVER HANDED YOU THE MONEY

4    DIRECTLY; IS THAT CORRECT?

5          A       THAT'S CORRECT.

6          Q       DID YOU EVER CHECK THE -- DID YOU CHECK OR

7    VERIFY THE LICENSE FOR OPERATION OF THE HAPPY TANNING ON YOUR

8    VARIOUS VISITS TO THE PLACE?

9          A       YES, SIR.

10         Q       DID YOU HAPPEN TO SEE THE OWNER OF THE SUBJECT

11   PREMISES?

12         A       WHICH TIME, SIR?  THEY WERE ALWAYS CHANGING

13   IT.

14         Q       LET'S SAY ABOUT BETWEEN OCTOBER OF 2000 AND 4

15   AND MAY OF 2000 AND 5.

16         A       I DON'T RECALL.  HOWEVER, I CAN TELL YOU THAT

17   IT WAS CHANGED ON THREE DIFFERENT DATES, THREE DIFFERENT

18   OWNERS.  THE LAST PERSON WAS JANUARY -- AT THE END OF JANUARY

19   I BELIEVE THE NAME OF TAMMY TRAN, BUT THERE WAS TWO OTHER

20   PEOPLE BETWEEN OCTOBER AND THAT TIME.

21         Q       WOULD YOU TELL ME THE NAME.

22         A       I DON'T RECALL, SIR.

23         Q       DID ANY OF THOSE NAMES APPEAR TO BE MR. HAU?

24         A       MR. HAU?  NO, SIR.

25         MR. PHAM:  NO FURTHER QUESTIONS, YOUR HONOR.

26         THE COURT:  MR. BARILLA.

1        MR. BARILLA:  YES, YOUR HONOR.  THANK YOU VERY MUCH.

2                    ^CROSS-EXAMINATION

3   BY MR. BARILLA:

4        Q      GOOD AFTERNOON, OFFICER LIMA.

5        A      GOOD AFTERNOON.

6        Q      OFFICER LIMA, WHEN YOU FIRST TESTIFIED, YOU

7   SAID THAT PRIOR TO THE NOVEMBER 16TH TIME THAT YOU WENT

8   THERE, THERE WERE HOW MANY ARRESTS MADE OUT OF THAT

9   ESTABLISHMENT?

10       A      NUMEROUS, SIR.  HOWEVER, TEN MONTHS PRIOR TO

11  THAT INCIDENT 16 ARRESTS HAD BEEN MADE.

12       Q      OKAY.  WERE YOU INVOLVED WITH THOSE ARRESTS?

13       A      I WOULD SAY THE MAJORITY OF THEM, YES, SIR,

14  WHETHER IN ASSISTING OR SUPERVISING OR, YOU KNOW, BUT I WAS

15  ALWAYS THERE PRESENT.

16       Q      WERE THOSE ARRESTS MADE BY A WARRANT?

17       MR. PEAR:  OBJECTION; IRRELEVANT.

18       THE COURT:  SUSTAINED.

19       Q BY MR. BARILLA:  WHEN YOU MADE THOSE ARRESTS, WERE

20  YOU ACTUALLY -- DID YOU ACTUALLY GO IN AND WERE PART OF AN

21  UNDERCOVER OPERATION WHERE YOU SAW THE ACTIVITY WHERE SOME OF

22  THE GIRLS MAY HAVE APPROACHED YOU REGARDING SOME PROSTITUTION

23  ACTIVITY?

24       A      NOT ME, SIR.

25       Q      SO YOU WENT IN BASED ON SOME OTHER UNDERCOVER

26  OFFICER SAYING THIS TOOK PLACE, AND YOU WENT IN ON THE

REPORTER TRANSCRIPT pp. 111, 126

Reporter transcripts pp. 111, 126

1       A       I EVENTUALLY HAD A MEETING WITH MY SUPERVISOR,

2   ED CONTRERAS, SUPERVISOR JEFF MC LAUGHLIN, INVESTIGATOR RANDY

3   LITWIN FROM MY UNIT, AND INVESTIGATOR LONG NGUYEN.

4       Q       THAT WAS THE INVESTIGATOR WHO JUST LEFT THE

5   COURTROOM --

6       A       THAT'S CORRECT.

7       Q       -- AS YOU CAME IN?

8               AND WERE YOU APPRISED OF SOME INFORMATION OF

9   ALLEGATIONS MADE BY TUAN NGUYEN REGARDING DAVID LIMA?

10      A       YES, I WAS.

11      Q       WAS THAT MEETING HELD ON MARCH THE 9TH?

12      A       UM --

13      Q       THE MEETING WITH YOUR SUPERVISOR AND LONG

14  NGUYEN.

15      A       I'D HAVE TO REFER TO MY NOTES.  I CAN'T

16  REMEMBER IF IT WAS THE 9TH OR THE 10TH.

17      Q       FOLLOWING THE MEETING, WHAT DID YOU DO?

18      A       FOLLOWING THE MEETING, INVESTIGATOR LONG

19  NGUYEN AND RANDY LITWIN WENT TO GO TO MR. NGUYEN'S RESIDENCE

20  TO PICK HIM UP, AND I PREPARED AN INTERVIEW ROOM TO CONDUCT

21  AN INTERVIEW.

22      Q       DO YOU RECOGNIZE TUAN NGUYEN HERE IN COURT

23  TODAY?

24      A       YES, I DO.

25      Q       WOULD YOU IDENTIFY HIM FOR THE RECORD.

26      A       HE'S THE GENTLEMAN AT THE TABLE HERE IN THE

1   COPY OF THE INSTRUCTIONS IN THE JURY ROOM FOR DELIBERATIONS.

2           MEMBERS OF THE JURY, YOU HAVE HEARD ALL THE

3   EVIDENCE AND NOW IT IS MY DUTY TO INSTRUCT YOU ON THE LAW

4   THAT APPLIES TO THIS CASE.  THE LAW REQUIRES THAT I READ THE

5   INSTRUCTIONS TO YOU.  YOU WILL HAVE THESE INSTRUCTIONS IN

6   WRITTEN FORM IN THE JURY ROOM TO REFER TO DURING YOUR

7   DELIBERATIONS.

8           YOU MUST BASE YOUR DECISION ON THE FACTS AND

9   THE LAW.  YOU HAVE TWO DUTIES TO PERFORM.  FIRST ,YOU MUST

10  DETERMINE WHAT FACTS HAVE BEEN PROVED FROM THE EVIDENCE

11  RECEIVED IN THE TRIAL AND NOT FROM ANY OTHER SOURCE.  A FACT

12  IS SOMETHING PROVED BY THE EVIDENCE.  SECOND, YOU MUST APPLY

13  THE LAW THAT I STATE TO YOU TO THE FACTS, AS YOU DETERMINE

14  THEM, AND IN THIS WAY ARRIVE AT YOUR VERDICT AND ANY FINDING

15  YOU ARE INSTRUCTED TO INCLUDE IN YOUR VERDICT.  NEVER MIND.

16  NO FINDINGS.  LET ME READ THAT AGAIN.

17          SECOND, YOU MUST APPLY THE LAW THAT I STATE TO

18  YOU TO THE FACTS, AS YOU DETERMINE THEM, AND IN THIS WAY

19  ARRIVE AT YOUR VERDICT.

20          YOU MUST ACCEPT AND FOLLOW THE LAW AS I STATE

21  IT TO YOU REGARDLESS OF WHETHER YOU AGREE WITH IT.  IF

22  ANYTHING CONCERNING THE LAW SAID BY THE ATTORNEYS IN THEIR

23  ARGUMENTS OR AT ANY OTHER TIME DURING THE TRIAL CONFLICTS

24  WITH MY INSTRUCTIONS ON THE LAW, YOU MUST FOLLOW MY

25  INSTRUCTIONS.

26          YOU MUST NOT BE INFLUENCED BY PITY FOR OR

R.t. pp. 202-204

Reporter transcripts

R.t. pp. 202-204

Reporter transcripts

1          SO WITHOUT THAT EVIDENCE, THERE'S A

2  SUBSTANTIAL LIKELIHOOD THAT THE OUTCOME WOULD HAVE BEEN

3  DIFFERENT.  AND THERE'S NO QUESTION THAT AS A MATTER OF

4  LAW, IT'S DEFICIENT PERFORMANCE NOT TO RUN A MERITORIOUS

5  MOTION TO SUPPRESS EVIDENCE.

6          SO, BASED UPON THOSE COMMENTS AND ANY

7  QUESTIONS OF THE COURT, I'M PREPARED TO SUBMIT.

8      THE COURT:  MR. PEAR.

9      MR. PEAR:  YES.  JUST BRIEFLY, YOUR HONOR, AS TO

10 THE LATTER ISSUE ON THE MOTION TO SUPPRESS.

11         THE PEOPLE'S THEORY IS THAT THE MOTION TO

12 SUPPRESS, EVEN IF RUN AND EVEN IF GRANTED AS TO THOSE

13 THINGS THAT COUNSEL SUBMITTED, SHOULD HAVE BEEN

14 SUPPRESSED.  IT WOULD NOT HAVE HAD ANY IMPACT ON THE

15 TRIAL OR THE RESULT OF THE TRIAL AT ALL BECAUSE AS

16 COUNSEL SEEMS TO CONCEDE, THEY'RE NOT INTERESTED IN THE

17 ARRESTS OF THESE THIRD PARTY EMPLOYEES, BUT THOSE ARE

18 THE VERY BASES OF BRIBES.

19         SO, OUR POSITION ON THE CASE IS THE DEFENDANT

20 STILL WOULD HAVE BEEN IN THIS SITUATION IF THE POLICE

21 OFFICER ARRESTED THIS PERSON FOR PROSTITUTION.  THE

22 DEFENDANT PAID THE MONEY TO GIVE THESE GIRL'S A BREAK.

23         AS TO THE FIRST ISSUE ON THE PITCHESS MOTION,

24 I'LL SUBMIT ON THE ARGUMENT I MADE IN THE BRIEF.

25     THE COURT:  THE COURT'S RULINGS ARE PRIMARILY BASED

26 ON *STRICKLAND V. WASHINGTON*, WHICH IS AT 466 U.S. 668.

1    "AND RULING ON A MOTION FOR NEW TRIAL, THE DEFENDANT

2    MUST SHOW THAT THERE IS A REASONABLE PROBABILITY ABSENT

3    OR BUT FOR COUNSEL'S UNPROFESSIONAL ERRORS, THE RESULT

4    OF PROCEEDING WOULD HAVE BEEN DIFFERENT WHEN A DEFENDANT

5    CHALLENGES A CONVICTION.  THE QUESTION IS, WHETHER THERE

6    IS A REASONABLE PROBABILITY THAT ABSENT THE ERRORS, THE

7    FACT FINDER WOULD HAVE HAD A REASONABLE DOUBT SUSPECTING

8    GUILT."

9            I THINK IT'S PRETTY OBVIOUS THAT NONE OF US

10   HAVE BEEN ABLE TO FIND ANY CASE LAW SPECIFICALLY ON

11   POINT WITH REGARD TO THE QUESTION OF A PITCHESS MOTION

12   POST TRIAL AS TO EXACTLY WHAT STANDARD IS TO BE APPLIED.

13           AND I DISAGREE WITH MS. ERICKSON THAT IS

14   COMPLYING WITH THE STANDARD FOR PITCHESS.  AND IT WAS

15   REFRESHING TO SEE THAT YOU DID PICK UP ON THE COURT'S

16   RULING.

17           I DID FIND THAT THERE WAS MATERIAL THAT WOULD

18   HAVE BEEN DISCLOSED PRIOR TO TRIAL, BUT LOOKING BACK IN

19   RETROSPECT AFTER TRIAL, IT'S THE COURT'S CONCLUSION THAT

20   THAT EVIDENCE WAS OF SUCH LITTLE PROBATIVE VALUE THAT

21   NUMBER ONE, IT PROBABLY WOULD NOT HAVE BEEN ADMITTED TO

22   BEGIN WITH, BUT SECOND OF ALL, IT WOULD NOT HAVE MADE A

23   DIFFERENCE IN THE OUTCOME OF THIS TRIAL.  IT WOULD NOT

24   HAVE RAISED A REASONABLE DOUBT CONCERNING THAT

25   PARTICULAR OFFICER'S TESTIMONY.

26           SO, TO COME IN AND SAY THAT AT THIS POINT THAT

1   IF DEFENSE COUNSEL HAD RUN THAT MOTION AND DID HAVE THAT

2   INFORMATION, THE OUTCOME OF THE TRIAL WOULD HAVE BEEN

3   DIFFERENT.   I DISAGREE.   THEREFORE, I DON'T SEE A GROUND

4   FOR GRANTING A NEW TRIAL ON THE PITCHESS ISSUE.

5          THE SEARCH AND SEIZURE ISSUE IS A BIT MORE

6   COMPLEX.   THERE ARE PRIMARILY THREE SUPREME COURT CASES

7   THAT THE COURT LOOKED AT IN DETERMINING WHETHER OR NOT

8   THE DEFENSE'S CHALLENGE IS MERITORIOUS.

9          MINNESOTA V. CARTER, WHICH IS AT 525 U.S. 83,

10  DEALT WITH A SITUATION IN WHICH SOME INDIVIDUALS WERE

11  OVERNIGHT GUESTS IN AN APARTMENT AND WERE DEALING DRUGS

12  ON A PARTICULAR DAY.   AND IN THAT CASE, THE COURT

13  DETERMINED THAT PROPERTY USED FOR COMMERCIAL PURPOSES IS

14  TREATED DIFFERENTLY FOR FOURTH AMENDMENT PURPOSES THAN

15  RESIDENTIAL PROPERTY.   PURELY COMMERCIAL NATURE OF THE

16  TRANSACTION, RELATIVELY SHORT PERIOD OF TIME ON THE

17  PREMISES, AND THE LACK OF CONNECTION BETWEEN THE

18  RESPONDENTS AND THE HOUSEHOLD LED THAT COURT TO BELIEVE

19  THAT THERE WAS NO REASONABLE EXPECTATION OF PRIVACY BY

20  THOSE INDIVIDUALS DEALING DRUGS.

21          AN ADDITIONAL CASE IS O'CONNOR V. ORTEGA,

22  WHICH IS AT 480 U.S. 709.   THAT CASE BASICALLY HELD

23  WHETHER AN EMPLOYEE HAS A REASONABLE EXPECTATION OF

24  PRIVACY MUST BE DECIDED ON A CASE-BY-CASE BASIS.

25          AND THEN THERE WAS A CASE, NEW YORK V. BERGER

26  AT 483 U.S. 691, WHICH HELD THAT A BUSINESS OWNER'S

Clerk's transcripts pp. 238-259

Clerk's transcripts pp. 238-259

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JAN 20 2006

ALAN SLATER, Clerk of the Court

BY M. ZUNIGA , DEPUTY

1    KRISTIN A. ERICKSON
     Attorney at Law
2    State Bar #160953
     8502 E. Chapman Ave., #305
3    Orange, CA 92869

**ORIGINAL**

Dept. C-40

Motion #2-1040

Time est: ½ hour

DISTRICT ATTORNEY'S OFFICE
SANTA ANA, CALIFORNIA

4    Tele: (714) 602-2219
     Fax: (714) 389-1433

5

6    Attorney for Defendant
     *Tuan Nguyen*

IN CUSTODY
REMOVAL REQUESTED

7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9      **FOR THE COUNTY OF ORANGE, CENTRAL JUDICIAL DISTRICT**

10    PEOPLE OF THE STATE OF         )      CASE NO.05CF1163
     CALIFORNIA,               )

11                           )

12             vs.             )      NOTICE AND MOTION FOR
                          )      DISCOVERY PURSUANT TO

13    **TUAN NGUYEN,**             )      E.C. SECTIONS 1043-1047;
                          )      (*PITCHESS*) AND PURSUANT TO

14              Defendant.      )      BRADY V. MARYLAND; POINT'S,
                          )      AUTHORITIES, ARGUMENT;

15                            )      DECLARATION OF COUNSEL IN
                                        SUPPORT THEREOF.

16

17

18      **TO THE DISTRICT ATTORNEY AND THE CUSTODIAN OF RECORDS**

19    **FOR THE SANTA ANA POLICE DEPARTMENT:**

20      **NOTICE IS HEREBY GIVEN** that on February 10, 2006, at 9:00 a.m., or as soon

21    thereafter as the matter may be heard in Department C40 of the above-entitled court,

22    defendant Tuan Nguyen will move, and by this notice now moves this Court for an order of

23    discovery pursuant to Evidence Code sections 1043-1047 and pursuant to *Brady v. Maryland,*

24    (1963) 373 U.S. 83.

25      Specifically, this motion seeks the identities of all persons that filed personnel

26    complaints against the police officers involved in the subject incident. This request includes

27    complaints of misconduct relating to excessive force, physical and/or verbal abuse, violations

28    of citizen's Fourth Amendment rights, dishonesty and prior wrongful acts involving moral

   turpitude (including the falsification of police reports, false accusations of crime, perjury or

238

lying, harassment, bad temper, malevolence, bigotry, bias, prejudice or the misuse of equipment.)

The request for the identity of complainants includes their full names, aliases, last known residence and business addresses, home and work telephone numbers, California driver's license numbers, CII numbers, social security numbers, and other details that enable defendant to locate, questions and subpoena said persons.

Defendant also seeks disclosure of psychiatric/psychological records within the officers' personnel record that are probative of the officer's propensity for violence, abuse of power, false report writing and/or dishonesty. (*See Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 164.)

The officers involved in the subject action are: **Investigators D. Lima (#2373) and R. Tolosa (#2353),** of the Santa Ana Police Department.

This motion is made upon state statutory grounds and upon state and federal constitutional grounds. Specifically, it is made on the grounds that the personnel records of the above-listed officer contain evidence that is material to the defense of this case. That evidence is subject to disclosure under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536-537, *Brady v. Maryland,* (1963) 373 U.S. 83, and California Evidence Code sections 1043 and 1045, and is within the possession, custody and/or control of the Santa Ana Police Department.

This motion is based on this notice, the attached declaration of counsel, the attached points and authorities served and filed herewith, on all the papers and records filed in this action, and on such oral and documentary evidence as may be presented at the hearing of the motion.

Dated:    January 19, 2006                    Respectfully submitted,

Kristin A. Erickson
*Attorney for Tuan Nguyen*

2

239

## STATEMENT OF RELEVANT FACTS/PROCEDURAL HISTORY

Defendant has been convicted of bribery in violation of Penal Code section 67 for paying money to Investigators Lima and Tolosa on three dates: November 16, 2004, December 7, 2004 and January 25, 2005.   This court, having heard the testimony at trial, is familiar with the facts that were presented at trial.  Defendant has consistently denied the acts and claims the officers demanded money from him after engaging in a long pattern of abuse, harassment and actions violative of his constitutional rights at his place of business, Happy Tanning.

The first (November) of the three offenses, when defendant allegedly made the first offer, was not audio recorded.  The second and third offenses were audio recorded. On the second occasion (December), defendant was not present at the scene and he is not recorded. On that day, Lima entered the business and walked directly to the back of the business and opened a closed door.  He testified that he interrupted two naked individuals on the floor.  He claimed that defendant called on his cell phone during this time and told the officer his wife would take care of it.  Lima indicated he was given two envelopes containing cash.  On the third occasion (January) defendant was present and was recorded.  There is mention of "fifteen" but there is no direct mention of any bribes by the defendant.

Trial counsel substituted in shortly before trial.  Despite his defense these offenses did not occur, he did not file a *Pitchess* motion.  He made no attempt to discover any sort of impeachment material to use in cross-examination of the officers.  As set forth in the attached declaration (Exhibit A) the material sought by way of this motion was critical in developing a defense.  Counsel's failure to do so, since the evidence would have been discoverable, constituted incompetence and precluded counsel from adequately preparing for trial.

3

240

# POINTS, AUTHORITIES AND ARGUMENT

## I.

## DEFENDANT IS ENTITLED TO DISCOVERY OF COMPLAINTS AGAINST INVESTIGATORS TOLOSA AND LIMA.

The California Supreme Court has ruled that the basic principle underlying defense discovery in a criminal case stems from the "fundamental proposition that [an accused] is entitled to a fair trial and an intelligent defense in light of all relevant and reasonable accessible information. *(Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535. ) *Pitchess* made it clear that "'an accused. . . may compel discovery by demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial'." *(City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d. 74, 84.)

These fundamental principles have been applied by the California Supreme Court to allow criminal defendants to discover police personnel records. (*City of Santa Cruz v. Municipal Court, supra,* 49 Cal.3d 74, 84.) The Legislature codified these discovery rules (as they relate to police personnel records) in Evidence Code §§ 1043 to 1047. This codification served to expand these principles of discovery as they relate to police personnel records. As emphasized by the Supreme Court in *City of Santa Cruz*, "We have previously held that the Legislature, in adopting the statutory scheme in question, 'not only reaffirmed but expanded' the principles of criminal discovery articulated by this court in the landmark case of *Pitchess v. Superior Court...*" ( *Ibid.*)

A criminal defendant is entitled to discovery of any and all evidence that is both favorable to the accused and material on the issue of either guilt of punishment. (*People v. Abatti*, (2003) 112 Cal.App.4[th] 39, 51.)  Normally, discovery in any given case is in the hands of the prosecution, and the prosecution's failure to turn over such evidence violates the accused's constitutional right to due process. (*Ibid.*)  Since the requested evidence is not in the hands of the prosecution, the *Pitchess* procedure is the sole means by which a criminal defendant can obtain relevant and material information located in the personnel files of a police officer that are in the hands of a third-party agency. (*Id., at* 57.)

4

241

1    In order to obtain discovery of the type requested in this case, a criminal defendant

2  must first meet the requirements of Evidence Code § 1043. The threshold showing here is,

3  according to the California Supreme Court, "very low." (*City of Santa Cruz v. Municipal*

4  *Court* , *supra*, 49 Cal.3d 74, 83.) The Supreme Court has rejected the notion that a defendant

5  must follow the rather strict requirements of the various civil discovery procedures, noting

6  that such a procedure would run counter to the protections of the Fifth Amendment to the

7  United States Constitution in many instances. (*Pitchess v. Superior Court, supra*, 11 Cal.3d

8  531, 536.)

9    Recently, the California Supreme Court has reaffirmed that the good cause

10  requirement embodies a "relatively low threshold" for discovery and the supporting

11  declaration may include allegations based on "information and belief." (*People v. Samuels*

12  (2005) 36 Cal. 4th 96, 109 citing *City of Santa Cruz, supra*, at p. 94; Brant v. Superior Court

13  (2003) 108 Cal.App.4th 100, 106 [Information is material if it will facilitate the

14  ascertainment of the facts and a fair trial.]; *Abatti v. Superior Court* (2003) 112 Cal.App.4th

15  39, 51 ["[A] declaration by counsel on information and belief is sufficient to state facts to

16  satisfy the 'materiality' component of [Evidence Code section 1043]."]

17    On June 2, 2005, the California Supreme Court decided *Warrick v. Superior Court*

18  (2005) 35 Cal. 4th 1011.  The court confirmed the requirement set out in *City of Santa Cruz*

19  *v. Municipal Court, supra*, 49 Cal.3d at p. 84 that good cause for *Pitchess* discovery exists

20  when the defendant shows both materiality and a reasonable belief that the agency has the

21  type of information sought. (*Warrick, supra*, at p. 1027.)  Furthermore, "A showing of good

22  cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for

23  trial court review of 'all potentially relevant documents.'" (*Ibid.*, quoting *City of Santa Cruz,*

24  *supra*, at p. 84.)

25    The Court of Appeal in *Warrick* erroneously believed that the defendant's showing of

26  good cause must be "reasonably probable or inherently credible and not merely possible."

27  (Id. at p. 1025-1026.)  The Supreme Court rejected this definition of the defendant's burden

28                         5

1  because it imposed a greater burden than required by prior cases or statute. (*Id.* at p. 1026.)

2  Instead, "a plausible scenario of officer misconduct is one that *might or could* have

3  occurred." (*Id.* at p. 1026, emphasis added.) The Supreme Court also explained that the

4  trial court's task is *not* to weigh or assess the evidence. (*Ibid.*)

> To determine whether the defendant has established good cause
> for in-chambers review of an officer's personnel records, the
> trial court looks to whether the defendant has established the
> materiality of the requested information to the pending
> litigation. The court does that through the following inquiry:
> Has the defense shown a logical connection between the
> charges and the proposed defense? Is the defense request for
> *Pitchess* discovery factually specific and tailored to support its
> claim of officer misconduct? Will the requested *Pitchess*
> discovery support the proposed defense, or is it likely to lead to
> information that would support the proposed defense? 'Under
> what theory would the requested information be admissible at
> trial? If defense counsel's affidavit in support of the *Pitchess*
> motion adequately responds to these questions, and states 'upon
> reasonable belief that the governmental agency identified has
> the records or information from the records' (§ 1043, subd.
> (b)(3)), then the defendant has shown good cause for discovery
> and in-chambers review of potentially relevant personnel
> records of the police officer accused of misconduct against the
> defendant.

15  (*Id.* at p. 1027.)

16  Character traits of complaining witnesses for traits relevant to the defense may be

17  shown by specific acts, opinion, or reputation evidence. (Evidence Code §1103.) Once a

18  defendant shows relevancy, that the material cannot be obtained otherwise, and generally

19  specifies the material sought, the defendant is entitled to discovery of that material. (*In re*

20  *Valerie E.* (1975) 50 Cal.App.3d 213.) Police personnel information is discoverable in cases

21  where self-defense may not be a defense to the crimes charged. A showing of good cause

22  merely requires a defendant seeking *Pitchess* discovery to establish not only a logical link

23  between the defense proposed and the pending charge, but also to articulate how the

24  discovery being sought would support such a defense or how it would impeach the officer's

25  version of events. (*People v. Samuels, supra,* 36 Cal.3d at 1021.)

26  No personal statement of the intended defense by the defendant is required; an

27  affidavit of counsel of what the defense "may" be (such as the defense may be self- defense)

28

6

suffices. (*People v. Memro* (1985) 38 Cal.3d 658; *Kelvin L. v. Superior Court., supra*, 62 Cal.App.3d 823.)  There is no requirement whatsoever for a personal statement from the defendant. A *Pitchess* declaration authored by defense counsel alleging facts showing relevance is all that is needed, and the declaration need not be based upon personal knowledge, nor need it show there were prior complaints to get discovery. (*City of Santa Cruz v. Municipal Court, supra*, 49 Cal.3d 74.)  Moreover, the defense is entitled to utilize an in camera proceeding to present its declaration if privileged material may be revealed. (*City of Los Angeles v. Superior Court (Davenport)* (2002) 96 Cal.App.4th 255.)  Finally, a criminal defendant is not required to furnish foundational facts about the information being sought, because the defendant is not in a position to know whether the complaints in fact established the custom, habit, intent, motive or plan which is being alleged. (*People v. Memro, supra*, 38 Cal.3d 65.)

It makes no difference whether or not the police agency sustained the complaints or exonerated the officer. The complaints remain discoverable regardless of any action or inaction taken by the police agency. (*People v. Zamora* (1980) 28 Cal.3d 88.)  In addition, a criminal defendant is entitled to discover the discipline imposed upon a police officer as a result of citizen complaints of misconduct. (*City of San Jose v. Superior Court (Michael B.)* (1993) 5 Cal.4th 47.)  Finally, a defendant is also entitled to discover all Board of Rights proceedings initiated against a police officer. These quasi-judicial administrative proceedings are presumptively open to the public and the final decision of a Board of Rights is considered a public record.  (*Bradshaw v. City of Los Angeles* (1990) 221 Cal.App.3d 908.)  Any claim of privilege requires the imposition of sanctions when the material being sought is relevant to the defense. (*Dell M. v. Superior Court* (1977) 70 Cal.App.3d 782.)

## II.

### DEFENDANT IS ENTITLED TO DISCOVERY OF ANY INVESTIGATIONS CONCERNING INVESTIGATOR LIMA AND TOLOSA'S MISCONDUCT INVOLVING MORAL TURPITUDE.

There can be no doubt that *Pitchess* discovery includes discovery of an officer's morally turpitudinous conduct. (*Samuels, supra,* 36 Cal.4th at 110; *Warrick, supra,* 35 Cal.4th at 1027 [court found defendant met burden by outlining a defense raising the issue of the practice of the arresting officers to make false arrests, plant evidence, commit perjury, and falsify police reports or probable cause.] see also, *People v. Jackson* (1996) 13 Cal.4th 1164, 1220 [overbroad discovery request is properly narrowed by the trial court to misconduct similar to that alleged]; *People v. Memro, supra,* 38 Cal.3d at pp. 681-683 ["evidence that the interrogating officers had a custom or habit of obtaining confessions by violence, force" or threats would be admissible to support a coerced confession claim]; *People v. Gill* (1997) 60 Cal.App.4th 743, 750 [prior complaints that arresting officer fabricated probable cause and planted evidence were material to defense that drugs were planted on a defendant changed with drug possession].)

In *People v. Hustead,* (1999) 74 Cal.App.4th 410, 417, the Court of Appeal held,

> "[The People] argued at oral argument that *Pitchess* discovery motions are limited solely to issues of officer violence. Such is not the case. In *People v. Memro* (1985) 38 Cal. 3d 658, 214 Cal. Rptr. 832, 700 P.2d 446, the Supreme Court explained that the statues governing discovery motions 'do not limit discovery of such records to cases involving altercation between police officer and arrestees; the context in which *Pitchess* arose.' (*Memro, supra,* 38 Cal. 3d at p. 679.) Indeed, the Court also noted that 'one legitimate goal of discovery is to obtain information 'for possible use to impeach or cross-examine an adverse witness . . . . ' (*Foster v. Superior Court* (1980) 107 Cal. App. 3d 218, 227, 165 Cal. Rptr. 701.)' (*Id.* at p. 677.) Likewise, other cases have held that <u>Pitchess</u> motions are proper for issues relating to credibility. (See *Larry E. v. Superior Court* (1987) 194 Cal. App. 3d 25, 28-33, 239 Cal. Rptr. 264 [motion seeking discovery of complaints for 'aggressive behavior, violence or excessive force, improper police tactics, dishonest and racial or class prejudice' sufficient to require in camera review when minor alleged that he did not use force against the officers, that the officer's [sic] lied about his actions and planted evidence, and the information was relevant to show officers had a motive to lie and could show potential bias which would affect the officer's credibility as a witness]; *Pierre C. v. Superior Court* (1984) 159 Cal. App. 3d 1120, 1122-1123, 206 Cal. Rptr. 82 [discovery motion for records pertaining to 'racial prejudice, false arrest, illegal search and seizure, the fabrication of charges and/or evidence, and improper tactics . . . . ' sufficient because the minor alleged a defense of false arrest and alleged that a substantial issue at trial 'would be the character, habits, customs and credibility of the officers.'].)"

8

245

1   The California Supreme Court has repeatedly held that evidence of conduct
2   amounting to moral turpitude, should it exist, is admissible to help the trier of fact
3   determine whether any given witness is telling the truth or is the kind of person who
4   would subvert the truth-finding process. (*People v. Wheeler* (1992) 4 Cal.4th 284.)
5   The Supreme Court has never carved out an exception that allows police officers to
6   be able to testify unfettered by prior instances of morally turpitudinous conduct. No
7   witness is allowed to testify cloaked in a false aura of veracity.    Because such
8   evidence is admissible at trial, there must also be a mechanism allowing the
9   discovery of this evidence by the defense. Although couched in terms of a
10  prosecutor's duty to disclose evidence favorable to the defense, the Court of Appeal
11  in *People v. Santos* (1994) 30 Cal.App.4th 169, held that constitutional Due Process
12  requires a defendant be granted discovery of this type of evidence of misconduct
13  involving moral turpitude.

14      In sum, prior instances of dishonest behavior are admissible to impeach the
15  credibility of testifying police officers. Prior instances of lying are admissible; prior
16  instances of threats of force are admissible;  and any prior misconduct amounting to moral
17  turpitude is admissible to impeach a testifying witness. (*People v. Harris, supra*, 47 Cal.3d
18  1047, 1080-1082;  *People v. Mickle, supra*, 54 Cal.3d 140, 168; *People v. Wheeler, supra*,
    4 Cal.4th 284, 295- 297.)

19      It must be stressed that the Supreme Court did not create one rule for civilian
20  witnesses and a separate rule for police officers. The rule created by the Supreme Court
21  applies to all witnesses: if that witness has engaged in conduct amounting to moral
22  turpitude, that evidence is admissible to impeach the witness, subject only to the strictures
23  of Evidence Code § 352. A witness who engages in conduct amounting to moral turpitude
24  is a dishonest person who displays a morally lax character. This is true whether the witness
25  is a gang member who has strong-armed and bullied others or a police officer who uses his
26  or her badge as a shield to engage in improper conduct. The threshold standard established
27  by the Supreme Court is simply one of relevance. (*People v. Wheeler, supra*, 4 Cal.4th
28

9

246

284, 295-297.)  The information being requested, if obtained by the defense, either would be admissible itself or would lead to the discovery of admissible evidence. Thus, the information is discoverable.  (*In re Valerie E.* (1975) 50 Cal.App.3d 213.)

Here defendant alleges the officers were untruthful in their testimony.  Further, defendant alleges the officers engaged in a pattern or hostility and a pattern of violation of his constitutional rights, particularly under the Fourth Amendment.  Further, after years of harassment, defendant claims he was, in essence, shaken down by the officers in question. Any complaints involving acts of moral turpitude would not only have impeached the officers, but could have been utilized in corroborating defendant's allegations of abuse.

## III.

### DEFENDANT IS ENTITLED TO *BRADY* MATERIAL CONTAINED IN INV. TOLOSA AND LIMA'S PERSONNEL FILES, EVEN IF THAT MATERIAL IS MORE THAN FIVE YEARS OLD.

*Evidence Code section 1045(b)(1)* limits discovery to complaints not more than five years old.  However, discovery is grounded on the due process right to a fair trial.  (*See People v. Rutherford* (1975) 14 Cal.3d 399.)  Discovery of relevant information cannot be cut off merely because of the age of the information.  Even a remote complaint can have a substantial probative value or lead to other information, and only defense counsel is in a position to investigate and develop its value effectively.  Thus, material information contained in the officer's personnel files that is more than five years old must still be disclosed pursuant to *Brady v. Maryland,* (1963) 373 U.S. 83 and its progeny.

*Brady* establishes that the prosecution has a non-delegable duty to seek out and provide to the defense evidence that is favorable to the accused and is material to either guilt or punishment, including impeachment evidence. This duty flows from the prosecution's obligation to ensure a fair trial. (*Kyles v. Whitley* (1995) 514 U.S. 419, 439-440.)  "Although a criminal defendant does not have a general constitutional right to discovery, under Brady 'the prosecution must disclose to the

10

247

defense any evidence that is "favorable to the accused" and is "material" on the issue of either guilt or punishment.  Failure to do so [regardless of the good faith of the prosecution,] violated the accused's constitutional right to due process.'" (*Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 52.)

Evidence is "favorable" if "it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*Ibid.*)  Moreover, evidence is "material" under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*Ibid.*)  Impeachment evidence has been held to be material because "impeachment of a witness can make the difference between acquittal and conviction, especially where credibility is the major issue in a case and evidence at trial will consist of opposing stories presented by the defense and the prosecution witnesses." (*Ibid.*)

The prosecution's *Brady* obligation is neither dependent upon California's *Pitchess* discovery scheme nor limited by it. (*Pitchess v. Superior Court, supra,* 11 Cal.3d 531; Evidence Code § 1043 et seq.)  While *Brady* and *Pitchess* discovery may coexist and are even interrelated, *Pitchess* cannot serve to trump or limit the prosecutor's constitutionally based *Brady* obligations.

The California Supreme Court recently stated "the '*Pitchess* process' operates in parallel with *Brady* and does not prohibit the disclosure of Brady information." (*City of Los Angeles v. Superior Court (Brandon), supra* 29 Cal.4th 1 at 14.)  In *Brandon,* the court examined whether the five-year limitation on *Pitchess* discovery was constitutional.  Although the *Brandon* court held that the 5-year limitation on *Pitchess* records (1045(b)(1)) is not unconstitutional on its face, the application of this holding is limited, and should not prevent this court from following *Brady* requirements to the extent that destruction of documents in police personnel files has not already taken place.  In fact, the *Brandon* court so held, stating:

11

248

1

> "In holding that routine record destruction after five years
> does not deny defendants due process, we do not suggest
> that a prosecutor who discovers facts underlying an old
> complaint of officer misconduct, records of which have
> been destroyed, has no *Brady* disclosure obligation. At
> oral argument, the Attorney General, appearing as amicus
> curiae on behalf of the City, agreed that, regardless of
> whether records have been destroyed, the prosecutor still
> has a duty to seek and assess such information and to
> disclose it if it is constitutionally material." (*Id, at p.*
> 9746.)

2

3

4

5

6

7   The *Brandon* court continued:

8

> "The Attorney General, appearing as amicus curiae,
> advances a different view, which we find persuasive. The
> Attorney General asserts that the " '*Pitchess* process'
> operates in parallel with *Brady* and does not prohibit the
> disclosure of *Brady* information." We agree. As we
> recently explained in *People v. Mooc* (2001) 26 Cal.4th
> 1216, 36 P.3d 21, 114 Cal. Rptr. 2d 482, the *Pitchess*
> "procedural mechanism for criminal defense discovery . .
> . must be viewed against the larger background of the
> prosecution's constitutional obligation to disclose to a
> defendant material exculpatory evidence so as not to
> infringe the defendant's right to a fair trial." (*Id. at p.*
> 1225.) In the Attorney General's view, citizen complaints
> older than five years that the trial court after in chambers
> review finds to be " 'exculpatory,' as defined by *Brady*,"
> may be subject to disclosure, notwithstanding the five-
> year limitation in section 1045(b)(1)." (*Id, at p.* 9746.)

9

10

11

12

13

14

15

16

17         The *Brandon* court thus held that trial courts retain jurisdiction to review

18   citizen complaints still in existence that are over five years old and to release them to

19   the defense if the material is *Brady* material.  The court held that the trial court was

20   not foreclosed from reviewing and releasing citizen complaints by the statutory

21   limitation in 1045(b)(1).

22         Relying on the California Supreme Court's decision in *Brandon,* the Court of

23   Appeal in *Abatti v. Superior Court,* (2003) 112 Cal. App.4th 39,  held that a criminal

24   defendant is entitled to the discovery of *Brady* material greater than five years old that is

25   contained in a police officer's personnel files.  The *Abatti* court additionally explained

26   that the proper method for obtaining such *Brady* information, especially if it is in the

27   hands of a third-party agency, is by filing a *Pitchess* motion.

28                                          12

1    Abatti was charged with assault with a deadly weapon. (*Abatti, supra,* 112

2 Cal.App.4th 43-44.) One of the prosecution witnesses, Jesse Torres, was working at a

3 cycle center at the time of the alleged assault. He claimed Abatti came into the center

4 immediately after the incident and admitted being present at the scene of the assault; he

5 also "backed up" the victim's version of events. Torres had worked as a police officer

6 for the Calexico Police Department 11 years prior to the assault.

7    Abatti filed a *Pitchess* motion with the Calexico Police Department, claiming that

8 Torres was untrustworthy and had a history of fabricating facts. By way of the *Pitchess*

9 motion, Abatti sought discovery of all relevant and material *Brady* information that would

10 support his contention that Torres lied. The trial court denied Abatti's motion, stating that the

11 records sought were far beyond the five-year limitation provided for under the *Pitchess*

12 discovery statutes and that the information sought by Abatti was not material.

13    Relying on *Brandon,* the court of appeal reversed, holding that "the five-year

14 limitation of Evidence Code section 1045 for disclosure of complaints or the exclusion of

15 conclusions of investigations of those complaints in police officer records [is not] an absolute

16 bar to information sought in the older police officer records." (*Id.* at 60.) The court further

17 stated that California's statutory *Pitchess* process is the proper means by which a criminal

18 defendant can obtain such information. Addressing the fact that *Abatti* sought records

19 from Torres' former police agency employer, who was not involved in the investigation

20 of Abatti's case, the court stated,

21    "because *Pitchess* procedure is the sole means by which
information in confidential peace officer files can be obtained,
22    the preclusion of review from the personnel records of a peace
officer who may be a material prosecution witness because the
23    law enforcement agency holding the files is technically not on
the prosecution team in this case would defeat the rights of a
defendant to exculpatory evidence." (*Id., at* 58.)

24 The court went on to explain:

25    "As the court in *Ritchie* noted, a defendant has a due process
right to gain access to material exculpatory evidence for the
26    preparation of a defense. Similar to the circumstances in
*Ritchie,* the records sought in this case are confidential but
27    available by court order if they are material to the issues in the

28                                            13

pending case. The difference between *Ritchie* and this case is that California has a legislatively established, exclusive method for gaining access to police officer personnel records for discovery of such exculpatory material – the co-called *Pitchess* procedures previously discussed."

In the present case, defendant is claiming that officers Lima and Tolosa engaged in a pattern of harassment, abuse and violation of defendant's rights. Defendant alleges that the officers repeatedly engaged in a a pattern of violating his rights under the Fourth Amendment. The officers harassed and abused many of the customers and employees. Further, it is likely the defense at trial would have been that defendant alleges the officers are the ones that initiated the request for money once defendant filed a complaint with the city against them and/or to assure defendant the harassment would stop. Further, it is believed that these officer have a pattern of engaging in this sort of conduct and that they had a personal bias against defendant.

Defendant is therefore seeking discovery of complaints from Lima and Tolosa's personnel files that show they lack credibility by engaging in acts of moral turpitude, such as physical or verbal abuse, fabrication of police reports, assaults involving moral turpitude, or any other acts that show them to be generally untrustworthy. Said complaints will aid in defendant's request for a new trial in that they would have provided a potential defense that was not investigated by trial counsel. Even if there are complaints going back more than 5 years *Brandon* and *Abatti* make clear that a criminal defendant is entitled to *Brady* material.

### IV.

### THE DECLARATION OF COUNSEL FILED IN SUPPORT OF DEFENDANTS MOTION DEMONSTRATES MATERIALITY OF THE REQUESTED DISCOVERY UNDER BOTH *PITCHESS* AND *BRADY*.

The declaration of counsel attached as Exhibit A clearly establishes that the discovery sought by way of this motion is material both under *Pitchess* and *Brady*. Thus, the requested records and files of Lima and Tolosa relating to assaultive conduct, physical or verbal abuse, patterns of systematically violating Fourth amendment rights, lack of credibility, impeachment/cross-examination evidence, prior wrongful acts involving moral turpitude,

14

1    dishonesty, improper police tactics, and unprofessional/substandard police work are

2    absolutely relevant and necessary to the defense.

3         Defense counsel's strategy at trial is unknown.  It is clear he was arguing that

4    defendant did not do that with which he was charged.  The only way in which to effectively

5    run that defense, however, was to cross-examine the officers as to their prior conduct,

6    including the conduct alleged in counsel's declaration attached as Exhibit A.  Further, it is

7    believed that there is a likelihood that others have complained about the officers' pattern of

8    abuse, misconduct and violation of constitutional rights.  Counsel was under a duty to

9    conduct a full investigation of this matter.  He did not do so.

10        Defendant was entitled to the effective assistance of trial counsel. (*Strickland v.*

11   *Washington* (1984) 466 U.S. 668.)  A claim of ineffective assistance of counsel may be raised in

12   a motion for new trial prior to the pronouncement of judgment.  (*People v. Fosselman* (1983) 33

13   Cal.3d 572.)  A defendant's right to counsel encompasses the right to effective counsel which

14   means that counsel will conduct all inquiry and strategy only when well - prepared regarding

15   issues of law and fact.  ". . . [T]he defendant can reasonably expect that in the course of

16   representation his counsel will undertake only those actions that a reasonably competent attorney

17   would undertake.  But he can also reasonably expect that before counsel undertakes to act at all

18   he will make a rational and informed decision on strategy and tactics founded on adequate

19   investigation and preparation.  [Citations.]  If counsel fails to make a decision, his action - no

20   matter how unobjectionable in the abstract - is professionally deficient." (*People v. Ledesma*

21   (1987) 43 Cal.3d 171, 215.)  Counsel failed to do that prior to trial and this motion must be

22   granted now in order to properly proceed in a motion for new trial.

23        The documents requested are not only material under the more "relaxed" *Pitchess*

24   standards, but are material under *Brady* as well.  As explained above, defendant was

25   convicted of bribing these two officers.  According to the officers, the offers of cash came

26   out of the blue after over a year of arrests of girls for prostitution at defendant's place of

27   business.  In fact, the officers had been harassing defendant at his place of business over

28                                          15

252

1    many years.  They stepped up their patrol over the year prior to November 2004.  The

2    officers testified that they had made approximately 16 arrests over the 10 months preceding

3    November.  However, the officers did not mention that they came to the business on a daily

4    basis, came into the business, busted into the tanning rooms, which were closed.  On only a 6

5    occasions were arrests made.  Of the sixteen people arrested in those 6 days, 15 were either

6    charged and/or convicted.  During the course of those daily visits, the officers were abusive,

7    both verbally and physically.  They threatened the girls.  They threatened customers.

8        The only way the defense could have effectively confronted, cross examined, and

9    impeached the officers' credibility is to receive discovery from his personnel files of other

10   similar instances of excessive force, physical abuse, lack of credibility, veracity, fraud, moral

11   turpitude, dishonesty, untruthfulness, neglectful duty, and/or unbecoming conduct.

12       As explained in *Abatti*, "impeachment of a witness can make the difference between

13   acquittal and conviction, especially where credibility is the major issue in a case and

14   evidence at trial will consist of opposing stories presented by the defense and the prosecution

15   witnesses." (*Abatti v. Superior Court, supra* 112 Cal.App.4[th] at 52.)  Credibility was the

16   most critical issue in defendant's case.  Since the evidence sought by defendant to impeach

17   could have made the difference between his guilt or innocence as determined by a jury,

18   defendant has demonstrated that the information sought is both favorable and material under

19   *Brady.  (Id., at* 59.)

20                          **CONCLUSION**

21       For the reasons set forth above and set forth in the attached declaration, defendant

22   respectfully requests this Honorable Court to grant the requested discovery and order

23   disclosure of the information sought or dismissal of the above entitled action.

    Dated:    January 19, 2006              Respectfully submitted,

24

25

26                       KRISTIN A. ERICKSON

27                       *Attorney for defendant Nguyen*

28                         16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**DECLARATION OF COUNSEL IN SUPPORT OF REQUEST FOR DISCOVERY**

I, Kristin A. Erickson, hereby declare as follows:

1. That I am an attorney licensed the practice law in the state of California

2. That I represent the defendant Mr. Tuan Nguyen in this matter. The facts herein stated are personally known to me of firsthand knowledge, except as to those matters stated on information and belief, and if called as a witness I could testify to the following:

3. Defendant was charged and convicted of bribing Investigators Tolosa and Lima in connection with his business, Happy Tanning in Santa Ana.

4. Defendant was represented by Frank Barilla at trial. Mr. Barilla substituted in as counsel within days of the case being set for trial. Mr. Barilla did not conduct any investigation, nor did he file any written motions prior to trial. There is no indication he ever requested or received discovery regarding the prior arrests at Happy Tanning. He did not contemplate or run a *Pitchess* motion, nor did he request a continuance in order to determine whether one was necessary. Barilla generally attacked the officers' credibility and his general defense was that things were not as they appeared in the evidence presented. He intimated that the officers were lying or misrepresenting what actually occurred but he did not impeach them with any prior misconduct or actions that may have eroded their credibility.

5. In a case like this, where the defense depends upon attacking the credibility of the officers, it is critical to run a *Pitchess* motion to discover if the complaints made by the defendant have been made by others. It is critical to see if, as here, the officers have fabricated evidence in the past. Some impeachment material was available to counsel, but others required a request for discovery, such as the reports of prior visits to Happy Tanning and a request for the officers' personnel files. Counsel did neither and his failure to do so constitutes incompetence as this evidence is of critical importance in developing any defense.

6. The officers testified at trial that they had been conducting an ongoing investigation over the 10 months prior to November 2004. They testified that they had made

255