Volume 2 of 2  Clerk's transcript pp. 358-381

2 Clerk's transcripts pp. 358-381

1  KRISTIN A. ERICKSON                                    Dept. C-40
   Attorney at Law
2  State Bar #160953                    RECEIVED
   8502 E. Chapman Ave., #305   FILED                     Motion: 2-24-06
3  Orange, CA 92869                                       Time est: ½ hour
                              SUPERIOR COURT OF CALIFORNIA
                                  COUNTY OF ORANGE
4  Tele: (714) 602-2219       CENTRAL JUSTICE CENTER
   Fax: (714) 389-1433                                    IN CUSTODY
5                                   FEB 23 2006
   Attorney for Defendant                                 ORIGINAL
6  Tuan Nguyen              ALAN SLATER, Clerk of the Court

7                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

8           FOR THE COUNTY OF ORANGE, CENTRAL JUDICIAL DISTRICT

9

10 PEOPLE OF THE STATE OF              )      CASE NO.05CF1163
   CALIFORNIA,                        )
11                                     )
                                       )
12              vs.                    )      NOTICE AND MOTION FOR
                                       )      NEW TRIAL; POINTS,
13 TUAN NGUYEN,                        )      AUTHORITIES & ARGUMENT.
                                       )
14              Defendant.            )
                                       )
15 ─────────────────────────────────

16      TO THE PEOPLE OF THE STATE OF CALIFORNIA, BY AND THROUGH
   THE OFFICE OF THE DISTRICT ATTORNEY IN AND FOR THE COUNTY OF
17 ORANGE; DEPUTY DISTRICT ATTORNEY MICHAEL PEAR:

18      NOTICE IS HEREBY GIVEN that on February 24, 2006, at 9:00 a.m., or as soon

19 thereafter as the matter may be heard in Department C40 of the above-entitled court,

20 defendant Tuan Nguyen will move, and by this notice now moves this Court for an order

21 ranting a new trial pursuant to Penal Code Section 1181 and pursuant to state and federal

22 constitutional grounds.

23      Defendant by and through his attorney, hereby moves this court for an order granting a

24 new trial in this matter under Penal Code § 1181 and based upon violations of the guarantees

25 set forth in the state and federal constitutions and/or on grounds more particularly set forth in

26 this motion.  This motion is based on all papers in the court's file, the jury trial transcript,

27 exhibits, these moving papers, points and authorities, and any argument of counsel at the

28 hearing herein.

1  ### STATEMENT OF THE CASE/RELEVANT FACTS

2  This court presided over the jury trial in this matter and is familiar with the facts

3  presented by the prosecution and defense.  As such, a full recitation of the facts is not set

4  forth but relevant facts will be inserted as needed throughout the argument. Defendant has

5  been convicted of bribery in violation of Penal Code section 67 for paying money to

6  Investigators Lima and Tolosa on three dates: November 16, 2004, December 7, 2004 and

7  January 25, 2005.  Defendant has consistently denied the acts and claims the officers

8  demanded money from him after engaging in a long pattern of abuse, harassment and actions

9  violative of his constitutional rights at his place of business, Happy Tanning.

10  The first (November) of the three offenses, when defendant allegedly rendered the

11  first bribe, was not audio recorded.  The second and third offenses were audio recorded. On

12  the second occasion (December), defendant was not present at the scene and he is not

13  recorded.  On that day, Lima entered the business and walked directly to the back of the

14  business and opened a closed door.  He testified that he interrupted two naked individuals on

15  the floor.  He claimed that defendant called on his cell phone during this time and told the

16  officer his wife would take care of it.  Lima indicated he was given two envelopes containing

17  cash.  On the third occasion (January) defendant was present and was recorded.  There is

18  mention of "fifteen" but there is no direct mention of any bribes by the defendant.

19  ### POINTS, AUTHORITIES AND ARGUMENT

20  ### I.

21  ### INTRODUCTION

22  "[I]t has been said that one of the most prolific causes of miscarriages of justice is the

23  reluctance of trial judges to exercise the discretion with which they are clothed to grant a new

24  trial when the circumstances show that justice would be thereby served." (*People v. Love*

25  (1959) 51 Cal.2d 751, 758; *People v. Drake* (1992) 6 Cal.App.4th 92, 98.)   A motion for

26  new trial is the vehicle that allows a defendant to secure "a reexamination of the issue in the

27  same court, before another jury, after a verdict has been given." (Pen. Code § 1179.)  "The

28

2

1   granting of a new trial places the parties in the same position as if no trial had been had."

2   (Pen. Code § 1180.)  The motion is considered essential to the trial process and should not be

3   viewed by the trial court as a mere pro forma request. (*People v. Lopez* (1969) 1 Cal.App.3d

4   78, 82-83.)

5           A motion for new trial "is a legislatively established procedure which it is the right of

6   any convicted defendant to invoke. (*People v. Sarazzowski* (1945) 27 Cal.2d 7, 17.)  A

7   motion for new trial may be oral or in writing. (*People v Simon* (1989) 208 Cal.App.3d 841.)

8   It may be granted only on the defendant's motion, and "on the basis of one of the eight

9   grounds specified by the statute [] or on nonstatutory grounds where failure to do so would

10  result in a miscarriage of justice." (*People v. Whittington* (1977) 74 Cal.App.3d 806, 821 fn

11  8, [citations omitted].)   When a defendant has been denied the effective assistance of

12  counsel, he may raise this as a motion for new trial prior to the pronouncement of judgment,

13  even though it is not one of the enumerated grounds in section 1181 of the Penal Code.

14  (*People v. Fosselman* (1983) 33 Cal.3d 572.)

15          This court has greater power and discretion to grant a motion for new trial based upon

16  ineffective assistance of counsel than the appellate courts have in reversing the matter on

17  direct appeal or on habeas. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.)    As

18  the California Supreme Court pointed out in  *Fosselman*,  "[I]n appropriate circumstances

19  justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in

20  favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a

21  motion for new trial.  If the court is able to determine the effectiveness issue on such motion

22  it should do so." (*Id.* at 582-583; Cited with approval in *People v. Smith* (1993) 6 Cal.4th

23  684, 693.).  In ruling on a motion for new trial, the trial court "has very broad discretion, and

24  reviewing courts are reluctant to interfere with a decision granting or denying such a motion

25  unless there is a clear showing of an abuse of discretion." (*People v. Davis* (1973) 31

26  *Cal.App.3d 106, 111, citing People v. Robarge (1953) 41 Cal.2d 628, 633; See also People v.*

27  *Lyons* (1971) 18 Cal.App.3d 760.)

28                                          3

1   Defendant raises the following grounds in this motion for new trial:

2       **INEFFECTIVE ASSISTANCE OF COUNSEL**

3   Both the federal and state constitutions give a criminal defendant the right to

4 assistance of counsel and the right to counsel includes effective counsel. (U.S. Const., 6th

5 Amend.; Cal.Const., Art.I, sec.15; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

6 Specifically, a criminal defendant is entitled to "'the reasonable competent assistance of an

7 attorney acting as his diligent and conscientious advocate.'[Citations]" (*People v. Ledesma*

8 (1987) 43 Cal.3d 171, 215.)

9   The court in *People v. Ledesma* (1987) 43 Cal.3d 171, 217 noted the tremendous

10 importance of protecting a defendant's right to competent counsel when it held:

11    We must emphasize, however, that deferential scrutiny of
     counsel's performance is limited in extent and indeed in certain
12    cases may be altogether unjustified. '[D]eference is not
     abdication" (*People v. McDonald* (1984) 37 Cal.3d 351, 377);
13    it must never be used to insulate counsel's performance from
     meaningful scrutiny and thereby automatically validate
14    challenged acts or omissions. Otherwise the constitutional
     right to the effective assistance of counsel would be reduced to
15    form over substance.

16   A defendant's right to counsel encompasses the right to effective counsel which means

17 that counsel will conduct all inquiry and strategy only when well - prepared regarding issues

18 of law and fact.

19     . . . [T]he defendant can reasonably expect that in
     the course of representation his counsel will undertake
20    only those actions that a reasonably competent attorney
     would undertake. But he can also reasonably expect that
21    before counsel undertakes to act at all he will make a
     rational and informed decision on strategy and tactics
22    founded on adequate investigation and preparation.
     [Citations.] If counsel fails to make such a decision, his
23    action -- no matter how unobjectionable in the abstract --
     is professionally deficient. (See, e.g., *In re Hall, supra*, at
24    p. 426 [emphasizing that the exercise of counsel's
     professional discretion must be reasonable and informed
25    and founded on reasonable investigation and
     preparation]; *People v. Frierson, supra*, 25 Cal.3d at p.
26    166 [same]; see also *Strickland, supra*, 466 U.S. at pp.
     690-691 [implying that "strategic choices made after less
27    than complete investigation are [unreasonable] precisely

28         4

to the extent that reasonable professional judgments [do not] support the limitations on investigation"].)

(*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

A defendant who alleges incompetency of counsel must show that 1) counsel's performance was deficient in that "counsel's representation fell below an objective standard of reasonableness" and 2) that defendant was prejudiced as a result of counsel's deficiencies. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . .The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at pp. 693-694; *In re Fields* (1990) 51 Cal.3d 1063, 1069; *People v. Ledesma, supra,* 43 Cal.3d at 216.)

## PENAL CODE SECTION 1181

Penal Code Section 1181 states the various statutory grounds upon which application for new trial may be granted. It states in pertinent part:

> When a verdict has been rendered or a finding made against the defendant, the Court may, upon his application, grant a new trial, in the following cases only:
> . . .
> (5)When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, . . . .

Although the statute purports to limit the court's authority to grant a new trial to the specifically enumerated situations, the Legislature has no power to limit the court's constitutional obligation to assure a defendant a fair trial, i.e., the court's authority to grant a new trial cannot be limited to the enumerated situations. Broad discretion is necessary to ensure that defendants are accorded due process of law. (*People v. Fosselman, supra,* 33 Cal.3d 572, 582.)

5

362

## II.

### THE COURT ERRED WHEN IT IMPROPERLY DENIED DEFENDANT DISCOVERY OF COMPLAINTS AGAINST INVESTIGATOR LIMA TO WHICH HE WAS ENTITLED.

As stated above, Penal Code section 1181(5) authorizes a new trial when the court has erred on a question of law. The court improperly denied discovery to defendant of material and exculpatory evidence. This evidence would have been crucial in and of itself to impeach Lima. Additionally, it may have led to more impeachment evidence. Because there was evidence available for trial that would have called into question Lima's credibility, defendant must be granted a new trial for the opportunity of presenting the evidence.

After conviction, but prior to the date set for sentencing, defendant filed a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 and *Brady v. Maryland* (1963) 373 U.S. 83 requesting "the identities of all persons that filed personnel complaints against the police officers involved in the subject incident....includ[ing] complaints of misconduct relating to excessive force, physical and/or verbal abuse, violations of citizen's Fourth Amendment rights, dishonesty and prior wrongful acts involving moral turpitude (including the falsification of police reports, false accusations of crime, perjury or lying, harassment, bad temper, malevolence, bigotry, bias, prejudice or the misuse of equipment......Defendant also seeks disclosure of psychiatric/psychological records within the officers' personnel record that are probative of the officer's propensity for violence, abuse of power, false report writing and/or dishonesty. (See *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 164.)"

This court found that defendant made a sufficient showing of materiality and granted defendant's request for an in camera viewing of the officers' personnel records with regard to complaints involving perjury, moral turpitude, lying and general dishonesty. The court denied the request for complaints regarding excessive force or physical or verbal abuse and/or complaints regarding violations of citizens' Fourth Amendment rights. After viewing the files in camera, this court determined that, as to Tolosa, there was no discoverable

6

1   material.  As to Lima, however, this court indicated that **there was nothing contained in the**

2   **personnel file that would indicate defendant was denied the right to a fair trial**.  The

3   court misapplied the law and erroneously denied disclosure of material and exculpatory

4   evidence to defendant.

5       On a showing of good cause, a criminal defendant is entitled to discovery of relevant

6   documents or information in the personnel records of a police officer accused of misconduct

7   against the defendant. (Evid. Code, § 1043, subd. (b).)   Good cause for discovery exists

8   when the defendant shows both " 'materiality' to the subject matter of the pending litigation

9   and a 'reasonable belief' that the agency has the type of information sought." (*City of Santa*

10  *Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84.)  A showing of good cause is measured by

11  "relatively relaxed standards" that serve to "insure the production" for trial court review of

12  "all potentially relevant documents." (*Ibid.*)  To obtain in-chambers review and disclosure of

13  relevant materials a defendant need only demonstrate that the scenario of alleged officer

14  misconduct could or might have occurred. (*Warrick v. Superior Court* (2005) 35 Cal. 4th

15  1011.)

16      The only logical inference from this court's ruling regarding the contents of Lima's

17  personnel file was that one or more complaints of the type the court determined defendant

18  was entitled to did, in fact, exist.  Rather than disclosing that material to the defense, this

19  court went a step further and decided that, although the defense had made an adequate

20  showing of materiality, the evidence would not have been persuasive.   In so doing, this

21  court made a mistake similar to that reversed on appeal by the California Supreme Court in

22  *Warrick, supra,* 35 Cal. 4th 1011, 1024.

23      In *Warrick,* defendant was charged with possession of cocaine.  He sought to show

24  that the arresting officers had falsely arrested defendant and fabricated the facts in the arrest

25  report, thus, the defense sought to discover previous complaints against the officers for

26  dishonesty.   Defense counsel submitted a declaration in support of his *Pitchess* motion

27  giving the following version of events:  When officers got out of the patrol car, defendant,

28

7

364

1  who had an outstanding warrant, started to run away, but within moments the officers caught

2  him. Chaos ensued.  Later, as the officers collected objects from the ground they later

3  determined to be rock cocaine, an officer told defendant, " 'You must have thrown this.' "

4  Defendant denied possessing or discarding any rock cocaine and he was merely there to buy

5  cocaine. Defense counsel suggested that the officers, not knowing who had discarded the

6  cocaine, falsely claimed to have seen defendant, who was running away, do so.

7        The trial court denied the *Pitchess* motion, and refused to hold an in camera hearing,

8  based upon the court's determination that counsel's declaration in support of the motion did

9  not establish materiality because it did not provide a plausible defense.  The trial court

10  indicated: "It appears to me that this is not police misconduct but really an argument about

11  what happened, one that should be resolved by the trial court, but not one that gives rise to

12  looking at a police personnel file based on the paucity of information and the implausibility

13  of the defendant's allegation as to why somehow these officers must have engaged in

14  misconduct."

15        The Court of Appeal affirmed the judgement.  In reversing the Court of Appeal, the

16  California Supreme Court held that the Court of Appeal's conclusion that defendant's factual

17  scenario was implausible, not because his version of events could not have occurred, but

18  because in the court's view that version of events was unlikely, improperly elevated the

19  showing of good cause for *Pitchess* discovery beyond that required by law.

20              The question remaining is this: What degree
       or quantity of justification must the moving party
21       offer to establish a plausible factual foundation for
       the claim of officer misconduct? Here, the Court of
22       Appeal concluded that to be plausible a factual
       foundation must be reasonably probable or
23       apparently credible and not merely possible. In so
       doing, the Court of Appeal imposed a greater burden
24       on the party seeking Pitchess discovery than required
       by our prior cases or the statutory scheme. To
25       require a criminal defendant to present a credible
       or believable factual account of, or a motive for,
26       police misconduct suggests that the trial court's
       task in assessing a *Pitchess* motion is to weigh or
27       assess the evidence. It is not. A trial court hearing a

28                              8

1  *Pitchess* motion normally has before it only those
documents submitted by the parties, plus whatever
2  factual representations counsel may make in arguing
the motion. **The trial court does not determine**
3  **whether a defendant's version of events, with or
without corroborating collateral evidence, is
4  persuasive--a task** that in many cases would be
tantamount to determining whether the defendant is
5  probably innocent or probably guilty.

6  (*Warrick, supra*, at p. 1025-1026, emphasis added.)

7       The court held in *Warrick* that a credibility or persuasiveness standard at the *Pitchess*

8  discovery stage would be inconsistent with the statutory language and with previous

9  decisions requiring only that defense counsel's affidavit or declaration supporting a

10 defendant's *Pitchess* motion be made on information and belief.  Further, the court noted, the

11 legislative history of section 1043 shows that the "Legislature expressly considered and

12 rejected a requirement" that counsel's affidavit be made on personal knowledge. (*Id.*, at p.

13 1026 citing *Santa Cruz, supra*, 49 Cal.3d at pp. 88-89.)

14      In determining that Lima's personnel file contained nothing that this court believed

15 would have rendered defendant's trial unfair, this court similarly elevated the showing of

16 good cause for *Pitchess* discovery beyond that required by law.  Rather than complying with

17 the court's own determination that the complaints were material, and thus, discoverable, the

18 court added an extra hurdle for defendant: was the material likely to persuade the court that a

19 new trial was justified?   In so doing, the court necessarily weighed and/or assessed the

20 evidence, which *Warrick* specifically precludes the court from doing.

21      Not only was this court not authorized to measure the persuasiveness of the evidence,

22 it could not properly do so without providing the defendant an opportunity to investigate

23 whatever complaints were there.   The court could have no way of knowing whether the

24 complaints were going to lead to evidence that would have demonstrated prejudice in the

25 context of a motion for new trial.  From the face of the complaints, the court would have no

26 way of knowing whether that complaint would lead to additional witnesses that could   -

27 corroborate the misconduct or provide evidence of additional misconduct.   Discretion is

28                                         9

1  only properly exercised at the first stage of the analysis: whether the evidence is material. It

2  cannot be "sort of" material, or "kind of" material; it is either material or not. Once it is

3  determined the evidence is material it must be disclosed. Were a weighing of the evidence

4  allowed, the defense would forever be at a loss to address the issue, since the contents of the

5  file would be unknown. Even assuming the court's elevated standard was correct, the

6  defendant would necessarily need the opportunity to "weigh in" on the analysis.

7        Similarly, complaints remain discoverable regardless of any action or inaction taken

8  by the police agency; it makes no difference whether or not the police agency sustained the

9  complaints or exonerated the officer. (*People v. Zamora* (1980) 28 Cal.3d 88.) So, too, just

10 because the court may find the complaint unpersuasive or dubious, it is nevertheless

11 discoverable once the defendant has demonstrated materiality. The court misapplied the law

12 and as a result, defendant was improperly denied disclosure of material exculpatory evidence.

13 Defendant should have had an opportunity to present the complaints to the jury in order to

14 have the jury determine whether they affected Lima's credibility.

15

**III.**

**DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL**

16

**WHEN COUNSEL FAILED TO FILE A MOTION TO SUPPRESS**

**EVIDENCE.**

17

18       To demonstrate ineffective assistance of counsel, defendant must show his attorney's

19 representation fell below an objective standard of reasonableness and that he was prejudiced

20 as a result. (*Strickland v. Washington, supra*, 466 U.S. at 687) Failure to make meritorious

21 motions. (*People v. Gonzales* (1998) 64 Cal. App. 4th 432; *People v. Mattson* (1990) 50 Cal.

22 3rd 826) and failure to request and pursue all relevant discovery. (*Kimmelman v. Morrison*

23 (1984) 477 U.S. 365) are examples of conduct both the United States Constitution as well as

24 California jurisprudence recognize as objectively deficient assistance of counsel. Here, trial

25 counsel failed to make meritorious motions for exclusion of evidence. Counsel's failure to

26 file meritorious motions to suppress were based upon his lack of preparation and/time to

27 adequately prepare and run the motions.

28
10

367

1    When given a full and fair opportunity to explain his failure to so move, trial counsel

2  failed to provide any adequate explanation.  This negates any speculation that trial counsel

3  acted or failed to act for some tactical reason.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 434;

4  see also *People v. Pope* (1979) 23 Cal.3d 412, 426.)   Where the record fails to show reasons

5  why the attorney acted or failed to act, the claim need not be rejected if the attorney was

6  asked for an answer and failed to give one, or if there could be no satisfactory explanation.

7  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

8    Defendant has inquired of trial counsel in order to determine whether, in fact, he had

9  any acceptable reason for his failure to file a suppression motion or obtain discovery.

10  Counsel repeatedly dodged questions, always coming back to the point that he was only

11  allowed onto the case if he answered ready, that he came on and agreed to handle the case

12  "as-is" and that the file was incomplete or a mess when he received it.  At no time did he

13  directly answer the question regarding why he failed to file a suppression motion.  When

14  counsel was asked if he would like to be subpoenaed to court or whether he would sign a

15  declaration, he indicated he would sign a declaration containing the information contained in

16  Exhibit B.  Counsel indicated numerous times that he would read it, sign it and fax it back.

17  To date, this counsel has not received the declaration.

**A. Counsel was constitutionally incompetent for failing to file a suppression motion as to the observations of prostitution activity by officers Lima and Tolosa at Happy Tanning on November 16, 2004 and December 7, 2004.**

## Introduction

A bribe is defined as "anything of value or advantage, present or prospective, or any promise or undertaking to give any such thing asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in [his] [her] action, vote, or opinion, in any public or official capacity."  (CalJic 7.05)

Further, CalJic 7.10 sets forth the applicable law as follows:

It is essential to the crime of bribery that the subject matter upon which the bribe is to operate actually exists and has been or can be brought before the

11

1  officer in question in [his] [her] official capacity.

2  It is not necessary that the proposed act which is to be [influenced] [done] [omitted] by the bribe be a part of the performance of the duties imposed by
3  law upon the officer in question. It is sufficient that the act sought to be influenced is within the general scope of the officer's duties and within [his]
4  [her] apparent ability to perform.

5  Happy Tanning, as described by Lima and verified by defense counsel, is in a single

6  story strip mall.  The front door faces north and located by the front door is an employee

7  lounge and an office.   A hallway runs down the middle, dividing the business in half.  There

8  are 4 rooms, each with a door, and a restroom and shower room.  Each room has a tanning

9  machine and a mattress.  The office is equipped with surveillance cameras that monitor the

10  parking lot and street.  (Exhibit C)

11  A review of Lima's trial testimony, the police reports he generated and other

12  investigation reveals that on November 16, 2004, he and Tolosa went to defendant's place of

13  business, Happy Tanning.  (RT: 36)  They did not have a search warrant.   According to

14  Lima's testimony, within a few moments, five at most, he made an arrest of a Tiffany Mai for

15  prostitution.  (RT: 36)   According to Lima's testimony, Ms. Mai was in the "back room"

16  with a gentleman.  The room was "room number three, all the way to the back."  (RT: 37)

17  The tanning salon contains four separate tanning rooms, all of which have doors to maintain

18  privacy for the person(s) inside.  Lima and Tolosa only made their observations after

19  unlawfully opening the closed doors of the tanning rooms.  Neither was given permission to

20  do so.

21  On December 7, 2004 the officers returned to Happy Tanning.  Again, they did not

22  have a search warrant.  While Tolosa spoke to co-defendant Hau at the front desk, Lima

23  swept past, went into the hallway and began opening the individual doors to the tanning

24  rooms.  Lima went to the last room, opened the door and found a male and female naked on

25  the floor.  He also observed a condom on the night stand.  (Exhibit C)  He did not have

26  permission to open the door or enter the room.

27  The observations made during these two warrantless searches resulted in Lima's

28                                             12

1  testimony that prostitution activity was occurring on those two dates.  The prosecution's

2  argument was that defendant began bribing Lima and Tolosa on November 16, and again on

3  December 7, for the purpose of keeping them from arresting his girls for the prostitution

4  activity they were engaged in.  In other words, the evidence was used to prove that "the

5  subject matter upon which the bribe was to operate (prostitution) actually existed."  The

6  prosecution argued that defendant's intent to corruptly influence the officers could be

7  inferred by the fact that he was running a house of prostitution and that he "wanted to stay in

8  business a little longer." (RT: 146, 147)

9       The observations made by Lima and Tolosa on November 16 and December 7, 2004

10  were made in violation of defendant's right to be free from unlawful searches and seizures.

11  The officers were without warrants when they came into the business and began opening

12  doors and entering tanning rooms.  Those observations would have been suppressed had

13  counsel sought to exclude them by way of a motion brought pursuant to Penal Code section

14  1538.5.

15  **Applicable Law**

16       The Fourth Amendment, as applicable to the states through the Fourteenth

17  Amendment, provides that no search or seizure be conducted without the authority of a

18  warrant; and that a warrant may not be issued without probable cause.  (*People v. Williams*

19  (1999) 20 Cal.4th 119, 125.)  The United States Supreme Court has stated,

20       The Fourth Amendment provides that "the right
     of the people to be secure in their persons, houses,
21       papers, and effects, against unreasonable searches and
     seizures, shall not be violated . . . ." This inestimable
22       right of personal security belongs as much to the citizen
     on the streets of our cities as to the homeowner closeted
23       in his study to dispose of his secret affairs. For, as this
     Court has always recognized, "No right is held more
24       sacred, or is more carefully guarded, by the common
     law, than the right of every individual to the possession
25       and control of his own person, free from all restraint or
     interference of others, unless by clear and
26       unquestionable authority of law." [Citations.] (*Terry v.
     Ohio* (1968) 392 U.S. 1, 8-9.)

27

28                                    13

1     In order to claim a violation of one's Fourth Amendment rights, one must show an

2  expectation of privacy in the place searched or the thing seized. (*People v. Jenkins* (2000) 22

3  Cal.4th 900, 972; *Rakas v. Illinois* 439 U.S. at p. 134; *People v. McPeters* (1992) 2 Cal.4th

4  1148, 1171.) Searches conducted without the benefit of a warrant are per se unreasonable.

5  (*California v. Acevedo* (1991) 500 U.S. 565, 580.) The consequence of such a search and

6  seizure without a warrant is exclusion of the seized evidence. (*People v. Williams, supra*, 20

7  Cal.4th at p. 125, citing *Mapp v. Ohio* (1961) 367 U.S. 643, 643-660.)

8     There is no question the opening of the door, stepping in and looking around

9  constituted a search. "The term implies some exploratory investigation or an invasion and a

10  quest, a looking for or seeking out. . . . A search implies a prying into hidden places for that

11  which is concealed and that the object searched for has been hidden or intentionally put out

12  of the way." (*People v. West* (1956) 144 Cal.App.2d 214, 219; *Bielicki v. Superior Court*

13  (1962) 57 Cal. 2d 602, 605)

14     In a suppression motion, once the defendant makes a prima facie showing that the

15  government lacked a warrant, the burden then shifts to the prosecution to justify the legality

16  of the search or seizure. (*People v. Williams, supra*, 20 Cal.4th at p. 130.) Because the

17  officers in this case lacked a warrant, if the searches had been challenged, the People would

18  have borne the burden of establishing either that no search occurred, or that the search

19  undertaken by the officers was justified by some exception to the warrant requirement. (See

20  *Vale v. Louisiana* (1970) 399 U.S. 30, 34; *People v. Rios* (1976) 16 Cal. 3d 351, 355 [128

21  Cal. Rptr. 5, 546 P.2d 293].)

22     The "ultimate standard set forth in the Fourth Amendment is reasonableness" *(Cady v.

23  Dombrowski* (1973) 413 U.S. 433, 439.)   The two threshold questions that must be asked

24  are, first, did the defendant exhibit a subjective expectation of privacy? Second, is such an

25  expectation objectively reasonable, that is, is the expectation that one society is willing to

26  recognize as reasonable? (*Katz v. United States* (1967) 389 U.S. 347; *Bond v. United States*

27  (2000) 529 U.S. 334, 337-338; *California v. Ciraolo* (1986) 476 U.S. 207, 211.)

28                                    14

1    In *People v. Camacho* (2000) 23 Cal. 4th 824 the court considered whether

2 observations made by police officers through the window of defendant's residence that was

3 not visible from the street were lawfully made.  Officers went to the defendant's home and,

4 rather than going to the front door, one officer walked into the side yard of the house, which

5 was an open grassy area.  The officer saw defendant through the window. The officer

6 returned to the front of the house, and both officers proceeded through the side yard to the

7 window and observed defendant packaging cocaine.

8    The court held that under the circumstances, defendant's expectation of privacy was a

9 reasonable one and that the officers acquired the evidence by watching defendant from a

10 vantage point to which *neither they nor the public had been invited*.  The court held that a

11 warrantless search cannot be justified by police observations made from a position to which

12 the officer has not been expressly or implicitly invited.

13    Stated another way, in *People v. Lovelace* (1981) 116 Cal. App. 3d 541 the court held

14 that the basic test to be applied in determining the nature of the right of privacy in cases such

15 as defendant's is whether the person has exhibited a subjective expectation of privacy which

16 is objectively reasonable and, if so, whether that expectation was violated by unreasonable

17 governmental intrusion.

18    In *Bielicki, supra*, a vice squad was investigating homosexual activity that was

19 allegedly occurring in a public restroom.  The officer in that case made observations of the

20 defendant in a toilet stall by peering through a pipe about 13 inches long and 1 ½ to 1 3/4

21 inches in diameter, capped when not in use, that had been installed through the roof of the

22 building over two of the toilet booths. The court held the observations were made unlawfully

23 and suppressed the evidence.   The court noted that "[w]hile a search is not unreasonable if

24 made with the defendant's consent [citations], here petitioners obviously gave no actual

25 consent to being spied upon through the pipe in the ceiling. Nor can it be said that because

26 the restroom was open to use by the general public (1) petitioners "impliedly" gave their

27 consent to such observation, or (2) consent was unnecessary because there was no search."

28

15

1  (*Id.*, at p. 606.)

2      The court distinguished the spying in *Bielecki* from several cases in which police

3  entered a public place and made observations of criminal activity in plain view. In each of

4  the distinguished cases the police officers entered upon premises open to the general public

5  and while there saw, as any member of the public could also have seen, illegal objects or

6  activities justifying further search or arrest.

7      In *People v. Rayson* (1961) 197 Cal.App.2d 33, 39 an officer received an anonymous

8  tip regarding bookmaking occurring at a shoeshine parlor. From a public vantage point, the

9  officer made several observations consistent with bookmaking, including the presence of the

10  shine parlor at the address given; the layout of the premises; the people entering the center

11  room by way of the shine parlor and leaving with no pretense of getting a shine; the

12  defendant receiving from these persons what appeared to be money and making notes on a

13  piece of paper after speaking to them. The court found this information amounted to

14  probable cause for defendant's arrest. The court stated that "[m]ere presence on the land of

15  another does not bar reliance and action on what is seen from such a vantage point.

16  [Citations.] A search implies a prying into hidden places for that which is concealed and that

17  the object searched for has been hidden or intentionally put out of the way; the mere looking

18  at that which is open to view is not a search. [citation]." (*Id.*, at p. 39; accord *Thorp v.*

19  *Department of Alcoholic Beverage Control* (1959) 175 Cal.App.2d 489, 492 [barroom])

20      In *People v. Roberts* (1960) 182 Cal.App.2d 431, 437 police entered defendant's gift

21  shop and found several items of stolen property while looking at the displays for sale. The

22  defendant challenged the observations as an unlawful search. The court stated "Merely to

23  observe what is perfectly apparent to anyone who might be within the store is not a

24  search."(*Id.*, at 437-438.)

25  <u>**Analysis**</u>

26      According to the prosecution, defendant owned and operated Happy Tanning. The

27  business had a front door, which was always closed, and sometimes locked, during business

28                              16

1   hours. He kept a surveillance camera in the office that monitored the outside and the street.

2   On each of the four tanning rooms, the bathroom and the break room were doors that were

3   closed during business hours. In order to make any observations of prostitution activity, the

4   officers necessarily had to open the doors. They did not, and could not, make any

5   observations of this activity from any area in which the public is entitled to be. Their

6   opening of the doors and peering in constituted a search and these searches were conducted

7   without benefit of a warrant an without consent.

8        It is perfectly reasonable in a business, such as a tanning parlor, that guests would

9   want and expect privacy. Tanning often takes place in the nude, or in a bathing suit. Any

10  reasonable proprietor or this sort of business would keep doors on the rooms and would keep

11  them closed at all times. Mr. Nguyen did that; he exhibited a subjective and reasonable

12  expectation of privacy in the individual rooms by providing closed doors. He did not grant

13  permission to the officers to search his place of business. The illegal activity, unlike the

14  cases cited above, could not being viewed from outside the business or inside the business

15  without opening the doors. It would have not been "perfectly apparent" to anyone who might

16  have been within the business.

17       Despite having conducted many arrests at the business, the officers never bothered to

18  seek a warrant. Over time, as is evidenced by defendant's complaint to the City of Santa

19  Ana, the officers developed a pattern of walking in and searching the business. These

20  searches were unlawful.

21  **Conclusion**

22       Counsel's failure to move to suppress the November 16 and December 7 observations

23  was objectively deficient. Other than having "no time" he had no reason for failing to make

24  the motions.  Counsel has not indicated that he believed there was a motion to suppress

25  evidence. Either he knew of the motion and chose not to exploit it, which is objectively

26  deficient and prejudiced defendant, or, he didn't. If he did not recognize a motion to

27  suppress evidence, his failure to recognize it is objectively deficient. There is absolutely no

28                                    17

374

1  acceptable reason for failing to move to suppress inculpatory and prejudicial testimony such

2  as that set forth herein.  Had he moved to suppress the evidence, it is very likely the motion

3  would have been granted.  Had the defendant been able to proceed to trial without evidence

4  of ongoing prostitution, it is reasonably probable (ie, a probability sufficient to undermine

5  confidence in the outcome) the outcome would have been different.

**CONCLUSION**

7  Based upon the above and foregoing, defendant respectfully requests this court make

8  an order granting defendant a new trial.

9  Dated: February 22, 2006                    Respectfully submitted,

Kristin A. Erickson
*Counsel for Tuan Nguyen*

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR NEW TRIAL**

I, Kristin A. Erickson, hereby declare as follows:

1. That I am an attorney licensed the practice law in the state of California.

2. That I represent the defendant Mr. Tuan Nguyen in this matter. The facts herein stated are personally known to me of firsthand knowledge.

3. I spoke with trial counsel Barilla about his failure to file a motion to suppress evidence. Mr. Barilla was defensive and did not directly answer my questions. He indicated that he was only permitted to substitute in as counsel if he "called ready" for trial. He indicated that he did not receive a complete copy of the file from defense counsel, Rob Harley. He was forced to pick up the preliminary hearing transcript that previous counsel never picked up. He was forced to obtain discovery from co-defendant's counsel. He emphasized that he took the case "as-is" and that previous counsel had not filed anything. He would not, or could not, say whether he recognized there was a potentially meritorious motion to suppress evidence.

4. I eventually asked Mr. Barilla if he would come to court, rather than sign a declaration. I went over what is included in Exhibit B. Mr. Barilla indicated he is scheduled to be in Harbor Court on Friday, and that he would rather sign the declaration once he reviewed it. I confirmed that he would be at his office to receive the fax and I confirmed his fax number. He assured me he would be there and would cooperate.

5. I faxed the declaration to his office twice. It is the same fax number that I previously sent the substitution of attorney to, which he confirmed he had received. I confirmed with my fax machine that the fax went through on both occasions. I called his phone and received no answer. As of the writing of this declaration, I have not heard back from Mr. Barilla.

6. I have reviewed the police reports, the trial testimony and have investigated for myself the layout of Happy Tanning. It is as described by Lima in that there is a hallway that separate the two sides of the business. There are a total of four tanning rooms. On both sides, the rooms are secluded by doors that remain shut. Based upon my review of the

1    discovery and based upon my independent investigation, there is no question there was a

2    valid motion that should have been brought pursuant to Penal Code section 1538.5.  Further,

3    the evidence that would have been excluded would have strongly impaired the prosecution's

4    ability to argue the bribe, if it was thereafter believed there was a bribe, was connected to

5    ongoing prostitution activity.  It was critical for counsel to challenge that evidence, since its

6    seizure was so obviously unlawful.

7          I declare the above, to be true and correct under penalty of perjury.  Executed this

8    February 22, 2006, in Orange, California.

9

10

11

12                              Kristin A. Erickson, declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**

*[handwritten in left margin, rotated]* Original Declaration submitted with the motion was not signed. This one was submitted by counsel on 2/24/06. FB

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE,

CENTRAL JUDICIAL DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff,

vs.

TUAN NGUYEN,

        Defendant

Case No.: 05CF1163

DECLARATION OF TRIAL COUNSEL FRANK BARILLA.

I, FRANK BARILLA, hereby declare:

1. That I am an attorney licensed to practice law in the State of California;

2. That on or about September 30, 2005 I was substituted in as attorney of record to represent Tuan Nguyen in the above entitled case for the purpose of conducting a jury trial.

3. As a condition of granting the substitution, this court advised me I would receive no continuances and must answer ready. Previous counsel, Robert Harley, had not filed any pretrial motions, nor had he conducted any pretrial investigation or preparation that I was aware of. I advised the defendant I could not receive any continuances and he indicated he nevertheless wanted me to conduct the trial since Mr. Harley was no more prepared to proceed with the trial and defendant was unhappy with Mr. Harley's apparent lack of diligence on this case.

4. Mr. Harley did not appear in court to be relieved, nor did he provide discovery to me. When I finally received discovery, it was incomplete and I was forced to obtain discovery from co-defendant's counsel. Further, I had to pick up the preliminary hearing transcript from the clerk's office since it had not ever been picked up by Harley. I did not receive any discovery with respect to the previous prostitution arrests made at Happy Tanning. I did not request this discovery because I did not

-1-

380

1  believe them to be relevant since Mr. Nguyen had not been charged with crimes on

2  any of those days.

3      5. Because of the time limitations placed upon me by the trial court, I did not

4  make any requests for continuances, file any motions to suppress evidence and I was

5  forced to go forward with the case as it was when I received it.

6      6. I am sending this back by way of facsimile which shall serve as an original.

7      I declare under penalty of perjury that the foregoing is true and correct.

8  Executed on the 22nd day of February, 2006, at Santa Ana, California.

9

10

11  FRANZ BARILLA, Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

381

Volume 2 of 2 Clerk's transcripts pp. 438-470

2 Clerk's transcripts pp. 438-470

## CASE # 04-49690

| | |
|---|---|
| LIMA: | Where do you work at? |
| USC STUDENT: | I'm a student. |
| LIMA: | Where at? |
| USC STUDENT: | USC. |
| LIMA: | Wow, USC, huh? |
| USC STUDENT: | Yeah. |
| LIMA: | Are you excited that the Trojans won? |
| USC STUDENT: | Yes, number one. |
| LIMA: | Hmm . . . how old are you bro? |
| USC STUDENT: | I'm twenty. |
| LIMA: | Twenty.  Are you Vietnamese? |
| USC STUDENT: | Yeah. |
| LIMA: | Let me see your ID real quick. |
| USC STUDENT: | Okay. |
| LIMA: | Why don't you come out here again?  Let's go out this way, I'm just gonna get your information down. |
| USC STUDENT: | Okay. |
| TOLOSA: | Just go ahead and have a seat. |
| FEMALE: | (unintelligible) |
| LIMA: | Do you have a (inaudible) |
| TOLOSA: | Yeah. |
| FEMALE: | (unintelligible) |
| LIMA: | Come here.   Go over there. |

- 1 -

FEMALE:            Huh?  (unintelligible)

**(VOICES IN BACKGROUND)**

TOLOSA:            (inaudible) I'm not arresting you.  I'm just handcuffing you.

FEMALE:            (unintelligible)

TOLOSA:            I'm not arresting you and just handcuffing you.  Sit down right there.

MALE:              (unintelligible)

TOLOSA:            Sit down. We'll (inaudible)

LIMA:              Come here.  Bring her over here.  Come here.

TOLOSA:            Come out here then sit down.

LIMA:              Who's this?

HAU:               My sister.

LIMA:              Your sister?  All right.  Come on in.  Hey, what's up?

H. NGUYEN:         Come in? Can I go?

LIMA:              Come here.  How have you been girl?

H. NGUYEN:         Good.

LIMA:              How's everything?

H. NGUYEN:         Yeah.

HAU:               (Vietnamese)

H. NGUYEN:         (Vietnamese)

LIMA:              How are you doing?

H. NGUYEN:         Good.

LIMA:              Good?

H. NGUYEN:         Yeah.

- 2 -

| | |
|---|---|
| HAU: | (VIETNAMESE) |
| H. NGUYEN: | (VIETNAMESE) |
| HAU: | (VIETNAMESE) |
| H. NGUYEN: | (VIETNAMESE) |

**(CELL PHONE RINGING...TUAN NGUYEN CALLS LIMA FROM 200-5000)**

| | |
|---|---|
| LIMA: | Hello? Who's this? Danny? (PAUSE) |
| LIMA: | Danny, what's going on? Not much, man, I'm here at your place again. (PAUSE) You're in San Francisco?? |
| H. NGUYEN: | No San Fran. No he here. |
| LIMA: | Ohh . . . hey, I mean these guys are still . . . you know, this girls over here . . . uh . . . giving this guy a blowjob. The condom's right here and everything. Do you know what I mean? What? What? You know? I mean what did you want me to tell you? They're . . . they're still . . . I thought you guys were gonna get rid of this. Right? All right. All right. All right. Bye. |

**(PEOPLE TALKING IN BACKGROUND)**

| | |
|---|---|
| H. NGUYEN: | (VIETNAMESE) |
| MALE: | Am I going to get notice on it or? |
| LIMA: | No, hold on. I'll talk to you in a second. |
| MALE: | Okay. |
| LIMA: | You need an FI on her, right? |
| TOLOSA: | Yeah. |
| LIMA: | Dan . . . hey . . . uh . . . Danny . . . |

**(H. NGUYEN CELL PHONE RINGS. T. NGUYEN IS CALLING HER)**

| | |
|---|---|
| H. NGUYEN: | Hello? (PAUSE TALKING ON THE PHONE) |

H. NGUYEN:    (unintelligible) No I go with him over here. Yeah. (Pointed for me to follow her as she walked to the back room.

H. NGUYEN:    Yeah, right here. Yeah. He dropped something right here. Come here.

LIMA:    Okay. What happened?

H. NGUYEN:    Right here, I don't know, he drop something right here. Check. (She reached down lifted a table cover and handed me the two envelopes containing $500 each)

LIMA:    Hey, come here. Come here. Is . . . is Danny still on the phone?

:    Yeah.

LIMA:    He's on the phone?

H. NGUYEN:    Ah . . . no. He drop already. He dropped something.

LIMA:    Listen. Okay?

H. NGUYEN:    Okay.

LIMA:    Last time . . .

H. NGUYEN:    Yeah.

LIMA:    . . .how much was in here?

H. NGUYEN:    Hmm . . . I don't know. It's not mine . . . yes . . .

LIMA:    Listen . . .

H. NGUYEN:    . . . someone else.

LIMA:    . . . I'm asking you how much is in here?

H. NGUYEN:    I don't know.

LIMA:    I . . . Danny last time gave me five hundred.

H. NGUYEN:    . . . Yeah. I don't know.

LIMA:    How much is in here?

- 4 -

441

| | |
|---|---|
| H. NGUYEN: | I don't know. I don't check. I don't know. Last time somebody drop . . . umm . . . you can take . . . uh . . . to your department, yes. |

**(CELL PHONE RINGING  TUAN CALLING LIMA FROM 200-5000)**

| | |
|---|---|
| LIMA: | Hold on. Hold on. Yes, Danny. What . . . say that again. Oh, you sold the business to another person? |
| HOUNG: | Somebody drop something. Take to your Dept. |
| LIMA: | Well you know, like I said. I'm gonna . . . I was gonna arrest this girl because she's here doing this stuff here with this guy. |
| HOUNG: | Really. |
| LIMA: | Right. Right. Okay. Well . . . uh . . . hey . . . Danny . . . Danny, Danny let . . . let me ask you this. I thought . . . uh . . . you were gonna . . . uh . . . take care of me better this time. I know. I know but last . . . no, I . . . I'm just saying last time was five and this time is five too. You said it would be better next time. |
| HOUNG: | Next time . . . next time . . . |
| LIMA: | All right. All right |
| HOUNG: | Next time. |
| LIMA: | Will? |
| HOUNG: | Next time!! |
| LIMA: | I'll . . . okay, I'll . . . |
| HOUNG: | Next time!! |
| LIMA: | . . . I'll . . . uh . . . I'll let . . . I'll give her a break this time. All right? Okay. Bye. (Finished call with Tuan) |
| HOUNG: | Next time. |
| LIMA: | Next time more? |
| HOUNG: | Yeah. |
| LIMA: | Because last time it was five. |

- 5 -

442

HOUNG:      Uh . . . okay. Next time one . . . one. (Pointed to Tolosa and Lima)

LIMA:       A thousand? A thousand?

HOUNG:      I don't know.

LIMA:       One? One?

HOUNG:      Maybe someone drop something. Okay.

LIMA:       Mmm . . . okay.

HOUNG:      Thank you.

LIMA:       All right. Hey, hold on. Hold on. Oh, is this . . . this for Tolosa?

FEMALE:     Yeah. Okay.

LIMA:       Hold on. Hold on. Come here. Come here. Tolosa! Come here real quick. But he wanted more last . . .

HOUNG:      Okay next time I get it for him.

TOLOSA:     Hey, what's up?

HOUNG:      I forgot . . . some guy.

LIMA:       She . . . it's . . . it's . . . it's five again and they said next time . . .

HOUNG:      Next time one, one. (Talking to Tolosa)

LIMA:       One, one. Next time it's a thousand each.

HOUNG:      Okay. Two . . . two weeks.

TOLOSA:     In two weeks?

HOUNG:      In two weeks . . .one one

LIMA:       In two weeks

TOLOSA:     In two weeks?

LIMA:       . . . thousand each.

FEMALE:     One, one. Okay.

- 6 -

443

| | |
|---|---|
| LIMA: | All right. |
| HOUNG: | Great. |
| LIMA: | Shoot, now that's good for her. |
| TOLOSA: | Yeah. |
| LIMA: | What do you think, huh? |
| TOLOSA: | It's good. |
| HOUNG: | No good, no good . . . no good (unintelligible) okay.  Okay. |
| LIMA: | Mmm . . . okay.  All right. |
| HOUNG: | I know. |
| LIMA: | I'm just gonna get their information.  Okay? |
| TOLOSA: | All right. |
| HOUNG: | Yeah, sure. |
| LIMA: | I'm just gonna get their information . . . |
| HOUNG: | Okay. |
| LIMA: | . . . and then I'll leave. |
| HOUNG: | Okay.  Thank you.  Bye, bye. |
| TOLOSA: | What's you . . . what's your phone number? |
| FEMALE: | Uh . . . 6-1-9 . . . |
| TOLOSA: | 6-1-9 |
| FEMALE: | . . . uh . . . do you want . . . 8-6-1 . . . |
| LIMA: | What's . . . what's your phone number, Hooey? |
| MALE: | Uh . . . 7-1-4 . . . |
| LIMA: | Uh-huh. |

MALE:           4-2-5 . . .

LIMA:           I'm sorry.

MALE:           4-2-5 . . .

LIMA:           4-2-5 . . .

MALE:           0-8-1-6.

LIMA:           0-8-1-6.  Okay.

MALE:           I just use my cell.

LIMA:           Do you have any tattoos on you?

TOLOSA:         What is that?

FEMALE:         (inaudible) Oh, I just put the glitter . . . glitter like stickers for eyes for go party.

TOLOSA:         Okay.

FEMALE:         I'm always going to (unintelligible)

TOLOSA:         Club?  Okay.  How tall are you?  Stand up.

FEMALE:         Five-four.

TOLOSA:         Five-four and how much do you weigh?

FEMALE:         One hundred and five.

LIMA:           No tattoos, right?

MALE:           No.

LIMA:           What time is it?  Uh . . . six-forty.

FEMALE:         Can you . . .

TOLOSA:         Yeah.

FEMALE:         Can I get some water?
TOLOSA:         Yeah.

- 8 -

445

FEMALE:      Want some water?

TOLOSA:      No thanks.

MALE:        (unintelligible)

FEMALE:      (unintelligible)

LIMA:        What's today's date?

TOLOSA:      Uh . . . seven.

LIMA:        Hey, hey, shhh . . . stay here.

MALE:        (unintelligible)

LIMA:        That's okay. Just . . . just stay here.

TOLOSA:      All right.

MALE:        Sorry.

FEMALE:      (unintelligible) no good.

TOLOSA:      Ready?

LIMA:        Oh, I need a . . . can you get a FI on her?

FEMALE:      (unintelligible)

TOLOSA:      Do you have a (inaudible) with you?  Do you have a purse with your ID and stuff like that?

FEMALE:      (inaudible)

TOLOSA:      Yeah, (inaudible)

LIMA:        Hey, shhh . . . he's not your boyfriend.

FEMALE:      No.

LIMA:        Relax.  Stop playing dumb.  Does it look like I just started yesterday?  You're new here, right?  You're new here?

FEMALE:      Mmm . . .

- 9 -

446

LIMA:    Right?  I've been here for a long time, so stop with the BS about he's my boyfriend.  Please, give me a break.

TOLOSA:    (inaudible) picture (inaudible)

FEMALE:    (inaudible) just stand up?

TOLOSA:    Yes, stand up.

LIMA:    Here's his.  What's your name?  Do you have ID?

MALE:    Hmm?

LIMA:    ID?

MALE:    Huh?

LIMA:    ID.

MALE:    No.

LIMA:    What's your name?

MALE:    Duoc Wing, d . . .

LIMA:    Wing?

MALE:    Yeah, Wing, d . . . d-u-o-c.

LIMA:    What's your date of birth?  Hold on.  Just have a seat.

MALE:    Date of birth . . . uh . . . 10-2-64

LIMA:    What's your address?

MALE:    5-0-3-6 . . .

LIMA:    5-3-0-6 . . .

MALE:    (chuckle)

LIMA:    West Roosevelt.

MALE:    Yeah, yeah, at home.
LIMA:    See I know that.

- 10 -

447

MALE:        (chuckle) I know.  Okay.

LIMA:        So tell her not to play dumb like if I just started yesterday.

MALE:        What?

LIMA:        No, I'm saying she . . . she played dumb like huh?  Me boyfriend. Uh-unh.

MALE:        (unintelligible) okay, sorry.

LIMA:        She probably speaks better English than I do.

MALE:        (unintelligible) Okay, she's my (unintelligible)

LIMA:        What?  What's that?

MALE:        Uh-huh.

LIMA:        Next time you go to jail.  You go home.

MALE:        Yeah, yeah, you . . .

LIMA:        I'm giving you a break because of Danny.

MALE:        Uh-hmm.

LIMA:        Next time . . . you go home . . . you go jail.  All right?

MALE:        Yeah, next time go to jail.  Okay.  Thank you.

LIMA:        You know what I need (unintelligible) you don't have a camera in the car do you?

MALE:        Uh . . . yeah, my regular one.

LIMA:        I . . . I need pictures of . . . of the condom.

TOLOSA:      All right.

LIMA:        I mean if . . . because . . . we'll be waiting for CSI.  How do you pronounce your name . . . Hooey?

MALE:        Yeah, Hooey.
LIMA:        Hooey?  Do you work, Hooey?

- 11 -

MALE:          Uh . . . yes (inaudible)

LIMA:          What did he say?  No?

TOLOSA:        Come back out.

LIMA:          Have a seat.

**(CONVERSATION BETWEEN MALE & FEMALE IN VIETNAMESE)**

**(PAUSE)**

TOLOSA:        What do you want (inaudible)

LIMA:          Uh . . . pictures of all the players and then . . . umm . . .

TOLOSA:        Here's this.

LIMA:          . . . the condoms . . . of the condom.

TOLOSA:        Yeah . . . give me that light.

LIMA:          Where's it at.  Oh, here it is.  That's where the money was at so get a picture.  That's where she got the money out of.

TOLOSA:        Where?

LIMA:          Underneath the . . . just get a picture of the whole thing.  And then the room . . .  (pause) and then . . . and then of all them.

TOLOSA:        Here stand right there.

LIMA:          Stand right there.  Okay, you next.

FEMALE:        . . . uh . . .me

LIMA:          You.

TOLOSA:        Look over here.

LIMA:          You next.

FEMALE:        (sigh)

LIMA:          Have you ever . . . what have you been arrested for?

- 12 -

449

TOLOSA:      Look up here.

FEMALE:      (unintelligible)

LIMA:        Hey you…What have you been arrested for?

FEMALE:      Nothing. No, I didn't take off.

LIMA:        Hey, you.  Shhh . . . shhh . . . what have you been arrested for?

FEMALE:      She doesn't . . .

LIMA:        Hey, Buddy, shhh shhh, come here.  Come here.

MALE:        (unintelligible)

FEMALE:      She doesn't say nothing.  That's why she ask me what you mean.
             That's why I tell her (inaudible) can I speak (unintelligible) for
             her?

LIMA:        I'm gonna let you go, okay?  But I don't wanna catch you doing
             this again.

HOUNG:       No more.

LIMA:        Hey, come here real quick.  (Walked back)

HOUNG:       Lima, Danny said before Christmas . . . give you big envelope
             Okay?

LIMA:        Hey, look.

FEMALE:      Yeah, I know.

LIMA:        Condoms, get rid of it.

HOUNG:       Merry Christmas Happy New Year.

LIMA:        All right.

TOLOSA:      All right, good night.

HOUNG:       Thank you sir.

LIMA:        Bye, bye.

- 13 -

MALE:              Thank you sir, yeah, good night.

LIMA:              Huh?

MALE:              Merry Christmas

LIMA:              Merry Christmas.  I hope it's on, man.  Ford, five, David, Tango
                   Romeo eight seven eight.  Fuck.

TOLOSA:            You want me to turn it off?

**(END OF TAPE)**

- 14 -

451

⊠ Identification

☐ In Evidence

**EXHIBIT NO.** 2-A

☐ Plaintiff
☐ Petitioner
☒ People

☐ Defendant
☐ Respondent

☐ Court

SIGNATURE-Atty/Party introducing sensitive Exhibit

Case No._____05CF1163_____

PEOPLE OF STATE OF CALIFORNIA_____
                                        Plaintiff

NGUYEN, Tuan Phuong & HAU, Nghia Ngoc_____
                                        Defendant

Marked for Identification
Date _____ OCT 0 5 2005

Received in Evidence

Date _____

ALAN SLATER, Executive Officer and Clerk

By _____Jody Grinstead_____
                        Deputy

NOTE: THIS IS A PERMANENT RECORD OF THE COURT
        DO NOT REMOVE FROM COURTROOM

452

Okay, today is . . . uh . . . January 25, 2005, 4:42 p.m. And we will be entering . . . uh . . . Happy Tanning shortly. Uh . . . and . . . uh . . . it's me, Investigator Lima #2373, and Investigator Tolosa #2353 in a gray Astro van. It's partly cloudy.

| | |
|---|---|
| TOLOSA: | Green. |
| LIMA: | Green. |
| TOLOSA: | (unintelligible) |
| LIMA: | (unintelligible) She's calling already. I see man. I see them. Are you gonna pass? |
| TOLOSA: | I will. |
| LIMA: | There's a couple of cars that look familiar. The door is open. I wonder if they're fixing it. Somebody's on the phone. |
| TOLOSA: | (inaudible) going back (inaudible) |
| MALE: | (unintelligible) how are you? |
| TOLOSA: | Hi. Wow. What's . . . what happened to your place? |
| FEMALE: | We remodeled. |
| TOLOSA: | You remodeled it. Oh, wow! |
| FEMALE: | (unintelligible) |
| MALE: | We remodeled, okay? |
| TOLOSA: | Ah, ha, ha. You guys are fixing it all up. |
| UNKNOWN: | Hello. |
| LIMA: | How are you doing? |
| UNKNOWN: | Good. |
| LIMA: | Why don't you to step out for a minute. |
| UNKNOWN: | Huh? |
| LIMA: | Step out for a minute. |

- 1 -

453

UNKNOWN:      Okay.

LIMA:      Do you got any guns or knives on you?

UNKNOWN:      No.

LIMA:      Step out this way.  Go sit next to that girl right there.

MALE:      (unintelligible)

FEMALE:      He very (unintelligible) he had to go to restroom.

TOLOSA:      He . . . is he a worker here?

FEMALE:      No.  He restroom . . . he . . . outside . . . he has bathroom.

TOLOSA:      He used the bathroom?  All right, have a seat right there for us.

MALE:      I opened the door for you.

TOLOSA:      I thought he was somebody doing work here.

LIMA:      What are you doing here?

UNKNOWN:      Oh I came by to (unintelligible)

LIMA:      Are you a worker here or did you come for a massage?

UNKNOWN:      No, I just came to wash my hands.

LIMA:      Okay.  Have a seat.  What's your name?

UNKNOWN:      Bruce.

LIMA:      Bruce, where do you live at, Bruce?  I'm sure you don't work around here do you?

UNKNOWN:      No, I just pick up tires from down the street.

LIMA:      I'm sure you don't live anywhere around here, right?

UNKNOWN:      No.

LIMA:      Where do you live at?

UNKNOWN:      In Laguna Hills.

LIMA:       Hmm . . . now why . . . now why did I figure that out?  Huh?

TOLOSA:     How are you doing?

UNKNOWN:    Hi, how are you?

TOLOSA:     Are you here for a . . .

UNKNOWN:    I don't have an appointment.

TOLOSA:     You don't have an appointment.

UNKNOWN:    Nah.

TOLOSA:     Do you like her?

FEMALE:     She's a model.

LIMA:       Do me a favor.  They're not giving blowjobs today.  If you come back here again, you're gonna get your ass arrested.  Do you understand that?

UNKNOWN:    Yes, sir!

LIMA:       All right.

UNKNOWN:    Thank you.

LIMA:       Why don't you take off?  Next time you come here, you're gonna get arrested.  Do you understand that?  Do I make myself clear to you?

UNKNOWN:    Yes, sir.

LIMA:       All right.

MALE:       Wait . . . uh . . . ten minutes.  Okay?

TOLOSA:     Ten minutes?

MALE:       Uh-huh.

TOLOSA:     Okay.  Ten minutes.

LIMA:       Can you close the door?

- 3 -

FEMALE:        (unintelligible)

TOLOSA:        Ten minutes.

LIMA:          Come here.  Come here.  Go over there.

FEMALE:        (unintelligible)

UNKNOWN:       Okay, bring (unintelligible)

TOLOSA:        What did . . . uh . . . why did you move this?

LIMA:          All right.

FEMALE:        Skinhead.

LIMA:          Skinhead, huh?

FEMALE:        Yeah.

MALE:          No . . . uh . . . name (unintelligible)

LIMA:          You know what I mean.  He's . . . he's new, huh?

UNKNOWN:       My sister, okay?

**(TELEPHONE RINGING)**

LIMA:          Your sister?

TOLOSA:        Hello?

LIMA:          MMM . . . uh . . . she's not your sister.

UNKNOWN:       My sister okay.  (chuckle)

LIMA:          I'm gonna take your picture.  Yes?  Because I said so.  I want a
               picture of you.

TOLOSA:        Hello.  Yes, it is.  Do we accept what?  Uh . . . no, we do not.  Uh-
               huh.

LIMA:          Nah.  I'm gonna take your picture.

FEMALE:        (unintelligible)

- 4 -

456

LIMA:           You're beautiful.  I'm gonna take a picture.  Come here.  Come here.  Stand over there.

FEMALE:         What picture?

FEMALE:         Picture, please.

LIMA:           Tell her I'm gonna take her picture or she's gonna go to jail.

*(female interpreting for other female)*

FEMALE:         (unintelligible) why you take picture me?

LIMA:           Because you're beautiful.

FEMALE:         Beautiful?  Okay.

*(female interpreting for other female)*

TOLOSA:         What did she say?

FEMALE:         She say why . . . she say why do . . . do picture?

TOLOSA:         Because she's beautiful.  She's like a model.

FEMALE:         I say you beautiful girl.

TOLOSA:         (inaudible) doesn't wanna take a picture.

LIMA:           Okay.

*(female and male speaking in Vietnamese)*

FEMALE:         Me too?  Why you get?  You have a lot.

LIMA:           I know.  I know.

FEMALE:         Why??

TOLOSA:         'Cause you're beautiful.

FEMALE:         Thank you.

LIMA:           Look at . . . you're (unintelligible) No.

MALE:           (unintelligible)

- 5 -

457

LIMA:          They're pretty.  You're not.

TOLOSA:        We don't wanna a picture of you.

MALE:          (unintelligible)

FEMALE:        (unintelligible)

MALE:          Nice, huh?  Name's (unintelligible)

TOLOSA:        It's very nice.  A lot more room now.

MALE:          Uh-hmm.  (unintelligible)

TOLOSA:        A lot of room.

MALE:          Uh-hmm.  (unintelligible)

TOLOSA:        It's a good . . . good show right here.

FEMALE:        Uh-huh.  No more tanning.  It clear.

TOLOSA:        No more tanning?

FEMALE:        No more tanning.

TOLOSA:        No more tanning beds?

FEMALE:        Yeah.

TOLOSA:        No?

FEMALE:        We have a place . . .

TOLOSA:        I think that guy wanted a tan.  No wonder!  He was in the wrong
               place.  No more tanning.  You don't need this anymore.

FEMALE:        Yeah, later we move.

TOLOSA:        You're gonna move?

FEMALE:        Yeah, later.

TOLOSA:        When?

FEMALE:        We . . . I don't know (unintelligible)

- 6 -

458

TOLOSA:        You don't know when?

FEMALE:        Unh-uh.

TOLOSA:        This year?  This year?

FEMALE:        Uh-hmm.

TOLOSA:        Wow!  Well, then why are you doing so much work?  Too much work.  What's your name?  What's your name?

FEMALE:        Dinh Lee.

TOLOSA:        Dinh Lee?  You don't like to talk, huh?

FEMALE:        (unintelligible) English.

TOLOSA:        You don't speak a lot of English?  What is she mixed with?

FEMALE:        Half and half, half American – half Vietnamese.

TOLOSA:        Who . . . which half is which?

FEMALE:        Hmm?

TOLOSA:        Which half . . . who's . . . uh . . . American?  Ask her.  Ask her who . . . who's American, her mom or her dad?

*(female interpreting for female)*

FEMALE:        Her dad.

TOLOSA:        Her dad is American?

FEMALE:        Her dad go to Army.

TOLOSA:        He go where?

FEMALE:        He go to Viet Nam.  Army in Viet Nam . . . met her mom.

TOLOSA:        Oh?  Are they still together?  Are they still together . . . your parents?  Ask her that.  Are they still married or they never married?

FEMALE:        Never married.

- 7 -

459

LIMA:      How . . . how's it going?

FEMALE:    Hmm?

LIMA:      How's it going?  Okay?  Good?  Bad?

FEMALE:    Scared.

TOLOSA:    What you scared about?

FEMALE:    (inaudible)

TOLOSA:    Mmm . . . are you scared of me too?  Huh?  Good?  Good.

LIMA:      Come here.

FEMALE:    (inaudible)

LIMA:      Hey . . . uh . . . how . . . how long have you been working here?

FEMALE:    Hmm?

LIMA:      How long have you worked here?

FEMALE:    Me?

LIMA:      Yeah.

FEMALE:    Today.

LIMA:      Where do you come from?

FEMALE:    San Jose.

LIMA:      San Jose?  Okay (inaudible)

FEMALE:    No.

LIMA:      Uh-hmm.

FEMALE:    Why?

LIMA:      I wanna know how long you've been working here?  How long?
           Hey . . . uh . . .

MALE:      Huh?  Huh?

- 19 -

471

LIMA:           How long has she worked here?

MALE:           (unintelligible) huh?

LIMA:           How long has she been working here?

MALE:           (unintelligible) today (unintelligible) okay?

LIMA:           Huh?

*(male and female talking to each other in Vietnamese)*

FEMALE:         Why?

LIMA:           Mmm . . . Mmm . . . she shy but she has been doing other things.

MALE:           (unintelligible) okay. She's with me. Okay. Okay?

FEMALE:         Let me wash my hands.

LIMA:           Mmm . . . all right. You guys behave.

TOLOSA:         See you later now.

MALE:           See you later (unintelligible)

LIMA:           All right.

**(WALKING TO CAR)**

LIMA:           What did he say again?

TOLOSA:         He . . . uh . . . gave . . . uh . . . two envelopes, fifteen hundred dollars each, and . . . uh . . . he tried to confirm that . . . uh . . . we should come in every month around this time to pick it up again so . . .

LIMA:           All right. That'll work. Okay. This is Investigator Lima again. Investigator Tolosa . . . we're back in our cars again. It's . . . uh . . . uh . . . 5:01 p.m.

TOLOSA:         (inaudible) 5110 (inaudible)

LIMA:           . . . and we're leaving Tanning . . . Happy Tanning at 5110 W. Seventeenth Street. We're turning off the wire now.

- 20 -

TOLOSA:     They were never married.  She's half, half.

LIMA:       Half, half what?

TOLOSA:     American.  Her dad was military.

LIMA:       She speaks English very well then.  Right?

FEMALE:     No.

LIMA:       Oh, she just acts like she doesn't.

TOLOSA:     How long have you been here . . . in America?

FEMALE:     Two years.

MALE:       Long time no see.

LIMA:       Hey, Tony!  What's been going on?

TOLOSA:     Where have you been?  Look at this outfit.  Where have you been in San Francisco?  Is it cold?  Is it gonna rain?

MALE:       I was (unintelligible) man.

TOLOSA:     Is it gonna rain or something?

MALE:       Where you guys been so long?

TOLOSA:     What's happened to all the tanning beds, man?

MALE:       Uh . . . we pitched (unintelligible) a new one.

TOLOSA:     What have you got here, ohh?  This is Wednesday.

MALE:       (inaudible) fifteen (inaudible)

TOLOSA:     How much?

MALE:       (inaudible) fifteen.

TOLOSA:     (inaudible) fifteen in this one and fifteen in this one?

MALE:       Yes.

TOLOSA:     They're both fifteen?

- 8 -

460

MALE:        Yeah.

TOLOSA:      All right.

MALE:        Where you been too long?

TOLOSA:      You know we've busy working and stuff like that.

MALE:        Oh, you on vacation, huh?

TOLOSA:      Too much vacation.

MALE:        Oh, more (unintelligible)

TOLOSA:      Hey . . . when . . . when's the next time we can we get some more
             of this?

MALE:        Sure.

TOLOSA:      When?  When?

MALE:        Uh . . . a month from now.

TOLOSA:      So like every month?

MALE:        Every month.

TOLOSA:      What . . . what day is . . .

MALE:        Uh . . . today is the twenty-third, right?

TOLOSA:      Twenty-third?

MALE:        24, right?

TOLOSA:      So like the end of the month?

MALE:        Yes.

TOLOSA:      So fifteenth next month?

MALE:        Yes.

TOLOSA:      All right.

- 9 -

461

MALE:           (unintelligible) store like one and half.

TOLOSA:         All right.

LIMA:           Do I?

UNKNOWN:        Yeah.

LIMA:           Turkey.

UNKNOWN:        Yeah, turkey.

TOLOSA:         Hey (inaudible)

LIMA:           Yeah.

TOLOSA:         Fifteen and fifteen.

LIMA:           Okay.  Right now?

TOLOSA:         Yeah.  I'll have 'em look.

LIMA:           Okay.

TOLOSA:         Hey . . . uh . . .

MALE:           (unintelligible) look good (unintelligible)

TOLOSA:         Hey, that's the sign we give (unintelligible)

MALE:           Ah, things go bad.

TOLOSA:         What do you mean?

MALE:           Bad, bad.  Another one . . . she (unintelligible)

TOLOSA:         That's it?

MALE:           She's the only girl around.

TOLOSA:         Is she any good though?

MALE:           Yeah.

TOLOSA:         Who's . . . who's the best girls?  Nada . . .

- 10 -

MALE:            (unintelligible) they come visit and (unintelligible)

TOLOSA:          (unintelligible)

MALE:            Fifteen girls.

TOLOSA:          Fifteen girls?

LIMA:            Fifteen girls?

MALE:            They call . . . uh . . . helicopter . . . make a lot of money.

TOLOSA:          What is it?

MALE:            Like . . . uh . . . check bones and you know (unintelligible) helicopter.

TOLOSA:          What's helicopter?

MALE:            Like next door right here.

LIMA:            Oh, oh, chiropractor!

MALE:            Chiropractor.

LIMA:            Chiropractor.

MALE:            Yes. Uh-hmm.

TOLOSA:          (unintelligible) Brookhurst and Katella?

MALE:            (inaudible)

TOLOSA:          Is that your place?

MALE:            Yes. The girl work for me before.

TOLOSA:          Yeah.

MALE:            (unintelligible) and open shop.

LIMA:            MALE: . . . a lot of girls?

MALE:            Four shops . . . now she own four shop in Garden Grove.

LIMA:            Fifteen girls?

- 11 -

MALE:           Fifteen (unintelligible) they try anything.

LIMA:           Good-looking ones.

MALE:           Massage, everything.

TOLOSA:         So you can get me one good-looking girl?

MALE:           No, I mean go on in and get some, you know?  That's not my shop but . . .

TOLOSA:         Get some . . . what?

MALE:           . . . they do better over there than I can.

LIMA:           We want some girls.

MALE:           Yeah, the girls, yeah.  They have fifteen.

LIMA:           Fifteen girls.

MALE:           Some girl they tourists from Viet Nam, all Vietnamese.

TOLOSA:         All Vietnamese girls?

MALE:           Yeah, no paperwork.

TOLOSA:         No paperwork?

MALE:           With them.

LIMA:           Yeah, but we want, you know . . .

TOLOSA:         We want a girl though.

LIMA:           We want a girl.

MALE:           You want a girl?

TOLOSA:         We want a girl like the kind that you used to have.

MALE:           (unintelligible) they have pretty girl day, but the girl with me right now is not good.

TOLOSA:         No?

- 12 -

464

MALE:       I cannot see her.

TOLOSA:     You used . . . you used to have good girls.

MALE:       Yes, of course - good, very good.

TOLOSA:     The ones that used to come from Texas were good.

MALE:       (unintelligible) just (unintelligible)

TOLOSA:     Those were good girls.

LIMA:       (unintelligible) right there.

TOLOSA:     We can wait a couple more days, but does she know what's she's doing?

MALE:       Uh . . . (unintelligible)

TOLOSA:     Or is she too new?

MALE:       (unintelligible) no, she twenty-five (unintelligible)

TOLOSA:     She's too new.  Twenty-five?

MALE:       Okay, come back next time.  So if you . . . can you go over there with me one time?

LIMA:       For what?  Do you have girls over there?

MALE:       (inaudible)

LIMA:       Huh?

MALE:       I want to stop them.

LIMA:       You want to stop them?

MALE:       I want to stop them.

LIMA:       Your . . . your . . .

MALE:       Or you can get some from there.

LIMA:       Your competition?

- 13 -

465

MALE:          Yes.

LIMA:          Okay.

TOLOSA:        Because they're hurting your . . . competition?  Are they hurting you?

MALE:          Yeah.

LIMA:          Brookhurst and Katella?

MALE:          Katella, right through . . . uh . . .

TOLOSA:        Oh, because they have so many girls they're hurting your business.

MALE:          Not really, but . . . uh . . .

TOLOSA:        Kind of.

MALE:          . . . but they have four . . . four shops.

TOLOSA:        Four shops.

MALE:          (unintelligible) Lampson one and Lampson one, on the corner. They have one over there too.

LIMA:          Yeah.

MALE:          . . . and one on Katilla and . . . uh . . . that's Anaheim city.  I think . . . uh . . .

LIMA:          So one's at Lampson and what?

MALE:          Lampson and . . . uh . . . Bookhurt and one at Bookhurt and Katilla.

LIMA:          And where's the other one?

MALE:          She do big right now.

LIMA:          What's her name?

MALE:          Uh . . . Tina . . . Nina . . . Nina . . . Nina, . . . Nina.

LIMA:          Okay.

MALE:          If you have time, you ready call me.

- 14 -

466

LIMA:           Hmm . . .

MALE:           We'll set up the time too.

LIMA:           What about . . . uh . . .

MALE:           This one she work like all day.

TOLOSA:         (inaudible)

MALE:           It's up to you, man, but . . . uh . . . I think that good today.  Huh?

LIMA:           Yeah, good.  Hey . . . umm . . . here let's come out real quick
                (inaudible)

MALE:           (unintelligible) before.

LIMA:           I'm talking about . . . I'm talking about owners.

MALE:           No, just Nina.

LIMA:           No new owners?

MALE:           No, new owners.

LIMA:           Okay.

MALE:           But . . . uh . . . if . . . if she wanna do something, yeah
                (unintelligible) the same thing.

LIMA:           The same thing.

MALE:           Just go ahead.  Everyone collect.

LIMA:           So her name's Nina?

MALE:           Nina.

LIMA:           Okay.  I'll tell . . .

MALE:           And her sister's Traty.

LIMA:           Tracy.

TOLOSA:         (unintelligible) writing.

- 15 -

| | |
|---|---|
| MALE: | T-r-a-t-y. |
| LIMA: | I'll . . . uh . . . |
| MALE: | And . . . uh . . . some girl Teresa . . . Viet Nam . . . three months work with no paper. |
| TOLOSA: | Are they all Vietnamese girls? |
| MALE: | All Vietnamese. |
| TOLOSA: | There's no Korean girls? |
| MALE: | No Korean. |
| TOLOSA: | Why aren't there any Koreans? |
| MALE: | Because they smart. You have to get them? |
| TOLOSA: | What do you mean? |
| MALE: | They smart, very smart girls. |
| TOLOSA: | The Korean girls? |
| MALE: | I mean Nina. |
| LIMA: | Umm . . . Nina used to work here. Right? |
| MALE: | Yeah, long time four years ago. |
| LIMA: | I think I remember Nina. |
| MALE: | Right now she . . . I think she thirty-eight or forty something like that. |
| TOLOSA: | Old . . . older girls. See . . . |
| LIMA: | We can . . . uh . . . do competition. |
| MALE: | That . . . |
| TOLOSA: | Do you wanna . . . |
| MALE: | Yeah, just score . . . scare. |

| | |
|---|---|
| TOLOSA: | Yeah, scaring 'em. |
| MALE: | Yeah, that's it. |
| TOLOSA: | What about like a little . . . would they be scared . . . |
| MALE: | (inaudible) customer when they come in. |
| TOLOSA: | I'm talking about what if . . . would they be scared by a drive-by there? |
| MALE: | No, they wouldn't be scared. |
| TOLOSA: | They wouldn't be scared if somebody sprayed the place? |
| MALE: | No, I don't think so. |
| TOLOSA: | Hey, get a cap and spray them. |
| LIMA: | We . . . we can get rid of them, okay? But . . . umm . . . do you know what a . . . do you know what a Mac 10 is? |
| MALE: | Mac 10? Who is it? |
| LIMA: | You know what a Mac 10 is? |
| TOLOSA: | Spray 'em with a Mac 10? |
| LIMA: | Do you know what an . . . do you know what an Uzi is? |
| MALE: | Yeah. Uzi, I know. |
| TOLOSA: | Spray it? |
| LIMA: | No. No. No. We can't do that. No. No. No. My birthday's coming up. |
| MALE: | (unintelligible) |
| LIMA: | I'm just saying. I'm just saying I've never had an Uzi before. |
| MALE: | Hmm . . . |
| LIMA: | I can take care of that. |

- 17 -

MALE:          Maybe next time you come in I give you the . . . the business card from there, the right play.

LIMA:          Okay.

MALE:          Okay.

LIMA:          But like I said I've never had an Uzi before.

MALE:          Just go and scare 'em one time two times.

LIMA:          Do you hear what I'm saying?

MALE:          So all the girls run around.

LIMA:          Did you hear what I'm saying?

MALE:          Yeah. I . . . I need someone . . . I need someone working here.

LIMA:          Okay, but I'm just saying maybe next time, you know, fifteen don't . . . don't worry about that.

MALE:          You know it's (unintelligible) right now (unintelligible) let me (unintelligible)

LIMA:          No. No. No. It's okay. It's okay. Don't worry. I'm just saying I know you . . . you have connections.

MALE:          I know. They come in couple of times and they talk to me.

LIMA:          Okay. And then maybe . . .

MALE:          And anyway I have to work to take care of you.

LIMA:          All right. Do you know what I'm saying?

MALE:          Okay (inaudible) one (inaudible)

LIMA:          All right.

MALE:          All right.

LIMA:          Excuse me, what's your name?

FEMALE:        (inaudible) what?

- 18 -